[L.A. Nos. 29762, 29763. In Bank. June 28, 1971.]

GENERAL MOTORS CORPORATION, Plaintiff and Appellant, v. CITY OF LOS ANGELES, Defendant and Respondent.

(Consolidated Appeals.)

230

## Counsel

Ross L. Malone, Donald K. Barnes, Paul H. Zalecki, Lawler, Felix & Hall and John G. Wigmore for Plaintiff and Appellant.

Roger Arnebergh, City Attorney, James A. Doherty, Assistant City Attorney, Ronald Tuller and Richard A. Dawson, Deputy City Attorneys, for Defendant and Respondent.

## Opinion

**SULLIVAN, J.**—Plaintiff General Motors Corporation (General Motors) appeals from two summary judgments in favor of defendant City of Los Angeles (the City) ordering dismissal of its complaints in two actions for refund of business privilege taxes levied against General Motors by the City for the years 1962-1967. The appeals are consolidated.

### I. Facts

The material facts, as set forth in affidavits before the trial court in connection with the respective motions for summary judgment, are not in dis-

pute. General Motors, a Delaware corporation with headquarters in Detroit, is a manufacturer of motor vehicles, parts, and accessories. Among its operating units are the Chevrolet Motor Division (Chevrolet) and the GMC Truck and Coach Division (GMCT&C)—neither of which is separately incorporated.

Chevrolet operates an assembly plant in the Van Nuys district of the City at which some 3,500 persons are employed. There it receives parts and components (such as engines, wheels, batteries, etc.) manufactured by other General Motors plants[1] (and, to a limited extent, by independent suppliers) and assembles them into finished vehicles. Also on the premises is an accounting and records office, whose function will be described below. The Los Angeles assembly plant has no responsibility for the styling or engineering of Chevrolet vehicles.

During the years here in question General Motors maintained three other Chevrolet assembly plants in the state. The Oakland plant was in operation through August 31, 1963, when it was discontinued, and the South Gate and Fremont plants commenced operations on September 1, 1963, and thereafter continued in operation. Prior to 1960 the Los Angeles and Oakland plants each assembled substantially all Chevrolet models (i.e., Biscayne, Bel Air, Impala, etc.), and substantially all Chevrolets distributed in southern California were assembled at the Los Angeles plant. However, in 1960, as a result of an increase in the number of Chevrolet models, it was considered no longer feasible to have duplicate assembly facilities for substantially all models. Accordingly, after 1960 the assembly of certain models was entrusted to one plant, the assembly of other models to another plant, and each plant supplied its models to the entire West Coast. The result was, and continues to be, substantial cross-shipping, so that dealers in the Los Angeles area were and are supplied by all three California assembly plants.

Chevrolet also has a "zone office" in the City, the primary function of which is the promotion of retail sales by independent Chevrolet dealers (to whom Chevrolet makes wholesale sales in a manner to be described below) located in the Los Angeles "zone."[2] (Some 68 people are employed

---

[1]All bodies used in the Los Angeles plant are manufactured by a Fisher Body Division facility located on the same premises. Substantially all other components are manufactured out of the City. For tax purposes the Fisher Body Division was treated as a part of the Chevrolet Division.

[2]According to one affidavit filed by General Motors, "The primary function of this Zone Office is to support the dealers' retail sales and profit-making efforts by advising them as to facilities, service problems, parts inventories, financial controls, sales staffing and training, sales promotion programs and materials, and all phases of the business."

at this office.) The territorial boundaries of the zone have varied over the years here in question, but they currently include Los Angeles and Orange Counties—in which there are 88 dealers.

During most of the period here involved the procedure by which independent retail dealers obtained vehicles at wholesale contemplated that the dealer place his order at his zone office,[3] which recorded the order and then forwarded it to the appropriate assembly plant—i.e., the assembly plant responsible for producing the particular model ordered. There the order was accepted and the vehicle shipped directly to the purchasing dealer upon the establishment of satisfactory arrangements for payment. Normally such arrangements involved financing through a line of credit advanced to the dealer by a financing institution, and upon shipment the assembly plant presented its invoice to the financing institution and instructed it to make payment to an assembly plant within the zone from which the order emanated.

GMCT&C manufactures highway trucks. Its main office and plant are located in Michigan, but it maintains a number of zone sales offices throughout the United States which process orders for vehicles from dealers within each zone.

GMCT&C also maintains a *retail* outlet in the County of Los Angeles. Prior to 1964 this outlet was located within the City but in 1964 it was moved to an unincorporated area outside the City. The retail outlet operates substantially like an independent retail GMCT&C dealer except that, because it is a part of and is operated by GMCT&C, no transfer of funds occurs when a vehicle is shipped from the plant to the outlet, and payments received from buyers are forwarded to the home office in Michigan.

GMCT&C salesmen engaged in the selling of trucks throughout the Los Angeles metropolitan area (including the City) maintain offices at the retail outlet, but they spend a substantial portion of their time at customers' places of business. Acceptance of orders and receipt of payment occur at the retail outlet offices. New vehicles are frequently delivered to the customers' places of business by store personnel. In addition to selling vehicles the retail outlet maintains a stock of parts and a service facility on the premises. Apparently the retail outlet also sells some trucks at wholesale to independent dealers.

---

[3]Beginning in 1966 dealers no longer placed orders at their zone offices. Instead, orders were placed by all California dealers at a "regional processing center" in Oakland.

II. PROCEEDINGS BELOW

In action No. 855175 (the Chevrolet action) plaintiff General Motors sought a refund of taxes assessed against and paid by Chevrolet for the tax years 1962-1967 pursuant to the City's business privilege tax ordinance, specifically Los Angeles Municipal Code (L.A.M.C.) sections 21.166 (wholesale) and 21.167 (retail).[4] The complaint alleged, and the answer essentially admitted, that the taxes in question were based upon the *total* gross receipts derived by Chevrolet from (a) sales of vehicles assembled at the Los Angeles plant, wherever such sales were made, and (b) sales to Los Angeles customers of vehicles assembled at plants outside the City; and, further, were based upon *15 percent* of gross receipts from sales to customers outside the City of vehicles assembled at plants outside the City pursuant to orders received at the Los Angeles zone office. Refund was sought to the extent that the gross receipts included in the tax base were not apportioned to reflect in-city versus out-of-city activities. The City's motion for a summary judgment was granted.

In action No. 879181 (the GMCT&C action) plaintiff General Motors sought a refund of taxes assessed against and paid by GMCT&C for the tax year 1964 pursuant to L.A.M.C. sections 21.166, 21.167 and 21.190.[5]

---

[4]The basic business tax section, L.A.M.C. section 21.03, subdivision (a), provided at all times here material: "(a) Subject to the provisions of this Article, a business tax registration certificate must be obtained and a business tax must be paid by every person engaged in any of the businesses or occupations specified in Sections 21.50 to 21.198, inclusive, of this Article; and a business tax is hereby imposed in the amount prescribed in the applicable section. No person shall engage in any business or occupation subject to tax under the provisions of this Article without obtaining a registration certificate and paying the tax required thereunder."

At all times material hereto prior to January 1, 1967, L.A.M.C. section 21.166 provided in part: "(a) For every person *manufacturing and selling* any goods, wares or merchandise *at wholesale, or selling* any goods, wares or merchandise *at wholesale,* and not otherwise specifically taxed by other provisions of this Article, the tax shall be $13.00 per year or fractional part thereof for the first $20,000.00 or less of gross receipts, plus $0.65 per year for each additional $1,000.00 of gross receipts or fractional part thereof in excess of $20,000.00; . . ." (Italics added.) Effective January 1, 1967, the rate of tax was increased.

At all times material hereto prior to January 1, 1967, L.A.M.C. section 21.167 provided in part: "(a) For every person *manufacturing and selling* any goods, wares or merchandise *at retail, or selling* any goods, wares or merchandise *at retail,* and not otherwise specifically taxed by other provisions of this Article, the tax shall be $12.00 per year or fractional part thereof for the first $15,000.00 or less of gross receipts, plus $0.80 per year for each additional $1,000.00 of gross receipts or fractional part thereof in excess of $15,000.00; . . ." (Italics added.) Effective January 1, 1967, the rate of tax was increased.

[5]L.A.M.C. sections 21.166 and 21.167 are set forth in footnote 4, *ante.* At all times material hereto L.A.M.C. section 21.190 provided in part: "(a) For every person engaged in any trade, calling, occupation, vocation, profession or other means of livelihood, as an independent contractor and not as an employee of another, and not specifically taxed by other provisions of this Article, the tax shall be $19.20 per

The tax had been based on the *total* gross receipts derived from the sale of trucks by the out-of-city outlet to customers in the City. Refund was sought to the extent that the gross receipts included in the tax base were not apportioned to reflect in-city versus out-of-city activities. The City's motion for a summary judgment was granted.

III. TRANSACTIONS IN ISSUE

There are four categories of sales transactions whose proper treatment for purposes of the City's business privilege tax is here in issue.

Of these, three categories are comprised of transactions whose gross receipts the City includes *in toto* within the tax base: (1) wholesale sales of Chevrolets assembled at the in-city plant and shipped to dealers outside the City pursuant to orders placed at either in-city or out-of-city zone offices;[6] (2) wholesale sales of Chevrolets assembled at out-of-city plants and shipped to dealers within the City pursuant to orders placed at the in-city zone office; and (3) retail sales of GMC trucks delivered from the out-of-city retail outlet to customers within the City after in-city solicitation of orders but out-of-city (retail outlet) consummation of transactions.

The remaining category is comprised of transactions whose gross receipts the City includes within the tax base *to the extent of 15 percent*. This category includes (4) wholesale sales of Chevrolets assembled at out-of-city plants and shipped to out-of-city dealers within the Los Angeles zone pursuant to orders placed at the in-city zone office.

The City's position as to each of these categories of transactions is based upon its City Clerk's Ruling No. 14. The content and history of Ruling 14 are thoroughly set forth in our recent opinion in *City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108, at pages 112-118 [93 Cal.Rptr. 1, 480 P.2d 953], and need not be repeated here. For present purposes it suffices to recite a summary of the operation of Ruling 14 which appears in *Shell*: "Ruling 14 . . . essentially sets up a rigid distinction between, on the one hand, receipts derived from sales of goods which *are* shipped from or into the City, and on the other hand, receipts derived from sales of goods which *are not* shipped from or into the City. Paragraph 1(c) of the Ruling, which deals with receipts in the former category, provides that *all* receipts from sales of goods 'which are in any manner *attributable*' (italics added)

year or fractional part thereof for the first $12,000.00 or less of gross receipts, plus $1.60 per year for each additional $1,000.00 of gross receipts or fractional part thereof in excess of $12,000.00."

[6]General Motors does not dispute the City's inclusion in the tax base of total gross receipts derived from sales of Chevrolets assembled at the in-city plant and shipped to *in-city* dealers pursuant to orders placed at the *in-city* zone office.

to in-city business functions and which *are* shipped from or into the City 'shall be considered directly attributable to the business engaged in within the City'—and therefore shall be included in the measure of the tax. In contrast, paragraph 1(d) of the Ruling provides that if a taxpayer has receipts attributable to both in-city and out-of-city activities, and those receipts result from the sale of goods which *are not* shipped from or into the City, either 15 or 25 percent—according to the presence or absence in the City of certain specified elements of the selling process . . . —of those gross receipts shall be considered 'directly attributable' and therefore properly included in the measure of the tax." (Fns. omitted.) (4 Cal.3d at pp. 124-125.)

Paragraphs 1(c) and 1(d) of Ruling 14 apply by their terms only to a person "engaged in such business [i.e., a business subject to tax under sections 21.166 or 21.167, L.A.M.C.] [who] owns, leases, occupies or otherwise maintains within the City a place or premises upon which or from which he engages in such business." Thus those paragraphs are applicable by their terms to transaction categories (1), (2), and (4) set forth above,[7] but they are inapplicable to transaction category (3)—i.e., retail sales of GMC trucks delivered from the out-of-city retail outlet to in-city customers.[8] However, the parties seem to agree that paragraph 1(b) of Ruling 14 (which paragraph is set forth in the margin),[9] along with City Clerk's Ruling No. 13 (also set forth in relevant part in the margin)[10] require that

---

[7]To recapitulate, the City takes the position that paragraph 1(c) permits taxation based on total gross receipts in transaction categories (1) and (2), and that paragraph 1(d) permits taxation based on 15 percent of total gross receipts in transaction category (4).

[8]The parties have considered GMCT&C a separate entity for purposes of determining liability under the subject tax and we concur in this approach. Therefore the presence of other General Motors facilities within the City does not render paragraph 1(c) or 1(d) applicable.

[9]"(b) If a person so engaged in business [i.e., engaged in a business subject to tax under L.A.M.C. sections 21.166 or 21.167] *does not* own, lease, occupy or otherwise maintain within the City of Los Angeles, a place or premises upon which or from which he engages in business, *those receipts which are specified by Ruling 13 for inclusion in the measure of the tax* shall be considered directly attributable to the business engaged in within the City of Los Angeles." (Italics added.)

[10]Ruling 13 provides in relevant part: "A person who *does not* own, lease, occupy or otherwise maintain within the City of Los Angeles a place or premises upon which or from which he engages in business, shall nevertheless be deemed to be *engaged in business* within the City when, through the physical presence of himself, of his agent, or of his employee, or his equipment, he carries on within the City of Los Angeles *substantial activities in connection with the conduct of his business.* Activities such as the following, which are illustrative only and are not intended to be a comprehensive summary, shall be deemed activities carried on in connection with the particular business to which they refer:

"(a) *Selling, offering to sell or soliciting the sale of personal property of any kind;*

"(b) *Selling, performing, supplying or furnishing, or offering to sell, perform,*

the tax on transactions in this category be based on all gross receipts derived therefrom.[11]

## IV. Legal Issues and Contentions

■ In our recent *Shell* decision we described the legal and constitutional framework within which our determinations in the instant case must be made. "[I]t is clear that in spite of the absence of a specific 'commerce clause' in our state Constitution, other provisions in that Constitution—notably those provisions forbidding extraterritorial application of laws and guaranteeing equal protection of the laws . . . —combine with the equal protection clause of the federal Constitution to proscribe local taxes which operate to unfairly discriminate against intercity businesses by subjecting such businesses to a measure of taxation which is not fairly apportioned to the quantum of business actually done in the taxing jurisdiction. ■ On the other hand, those constitutional principles do not *prohibit* local license taxes upon businesses 'doing business' both within and outside the taxing jurisdiction; as long as such taxes are apportioned in a manner by which the measure of tax fairly reflects that proportion of the taxed activity which is actually carried on within the taxing jurisdiction, no constitutional objection appears. ■ However, and conversely, no meas-

---

supply or furnish, or soliciting the sale, performance, supplying or furnishing of services or facilities of any character;

"(c) Leasing or renting, offering to lease or rent, or soliciting a lease or rental of personal property;

*provided* that in addition to the activities described or other activities connected with the conduct of his business and as the result of the described or other activities including activities of any nature designed to promote, stimulate or otherwise benefit his business, *he ships or causes personal property to be shipped into the City of Los Angeles,* or performs, supplies or furnishes services or facilities of any character within the City of Los Angeles.

"Whether other activities of a person having physical presence within the City, as described above, but no fixed place of business within the City, constitute substantial activities in connection with the conduct of the person's business shall be determined by an examination of the nature of the business engaged in, the manner in which it is carried on, the nature and extent of the activities carried on within the City, and the manner in which they are carried on, and such other facts as have a bearing upon the power of a city to impose the tax and the power and duty of the City Clerk to collect it." (Italics added.)

[11]Our examination of Ruling 13 in conjunction with paragraph 1(b) of Ruling 14 reveals what appears to be a hiatus in the reasoning underlying this conclusion. Whereas paragraph 1(b) of Ruling 14 indicates that as to those not having a place of business within the City "those receipts which are specified by Ruling 13" shall be included in the tax base, we have vainly searched the provisions of Ruling 13 for an enumeration of the receipts to be included. Thus the basis of the tax within the context of the City's tax rulings seems problematical. However this difficulty does not concern us in this case. The tax on GMCT&C has been *assessed and levied* on the basis of 100 percent of the taxpayer's gross receipts; the question before us is whether that tax is constitutional.

ure of apportionment can satisfy the constitutional standard if the measure of tax is made to depend upon a factor which bears no fair relationship to the proportion of the taxed activity actually taking place within the taxing jurisdiction." (4 Cal.3d at p. 124.)

We then observed that the apportionment scheme set out in Ruling 14 was *capable* of being applied in violation of these principles because "[t]hat formula, to the extent that it places decisive importance upon the situs of the goods at the time of shipment or delivery, rests upon a 'purely accidental and extraneous event that has no relation to the taxable event occurring in [the City] or the quantum of business there carried on.' " (4 Cal.3d at p. 125.) However, we went on to point out that more than the mere possibility of erratic or unconstitutional application of an apportionment formula must be shown by a taxpayer who challenges such a formula. █ " 'One who attacks a formula of apportionment carries a distinct burden of showing by "clear and cogent evidence" that *it results* in extraterritorial values being taxed.' (*Butler Bros.* v. *McColgan, supra,* 315 U.S. 501, 507. . . .)" (4 Cal.3d at p. 126.)

In *Shell* we concluded that the taxpayer—which had showed at trial that substantial elements of its sales process relating to the transactions there in question (i.e., sales to out-of-city dealers of gasoline stored within the City) took place outside the City—had sustained its burden. In the instant case we must likewise look to each of the four categories of transactions here in issue and determine whether General Motors has sustained its burden of showing by clear and cogent evidence that the particular application of Ruling 14 results in the taxation of significant extraterritorial values.[12] It is to this task that we now turn.

█ *Wholesale sales of Chevrolets assembled at the in-city plant and shipped to dealers outside the City pursuant to orders placed at either in-city or out-of-city zone offices.*

In *Carnation Co.* v. *City of Los Angeles* (1966) 65 Cal.2d 36 [52 Cal. Rptr. 225, 416 P.2d 129] we held that the tax upon one engaged in the City in "manufacturing and selling" (as opposed to merely "selling") under the provisions of L.A.M.C. sections 21.166 or 21.167 could be measured on the basis of the total gross receipts from the sale of the manufactured products wherever those sales occurred. Commenting upon this case in the course of our *Shell* decision we characterized the tax in question as

---

[12]These are appeals from two summary judgments in favor of the defendant City ordering dismissal of General Motors' complaints. Because the material facts are not in dispute, the sole issue before us is whether "a good cause of action exists on the merits." (Code Civ. Proc., § 437c.)

"fundamentally a tax upon the privilege of manufacturing" and indicated that, whereas the inclusion of unapportioned total gross receipts in the tax base was constitutional and proper under *Carnation* when the products in question were "wholly manufactured" within the taxing jurisdiction, an apportionment of gross receipts might be required by the principles of *Shell* in a case involving products which *were not* "wholly manufactured" within the taxing jurisdiction. (4 Cal.3d at pp. 127-128, fn. 18 and accompanying text.)

It is urged by General Motors, albeit with less than enthusiastic vigor, that the rule of *Carnation* is inapplicable to this case because the Chevrolets produced at the in-city assembly plant are not "wholly manufactured" there but rather are merely assembled out of parts and components many of which are manufactured at other General Motors plants. We reject this contention.

█ Although we can conceive of instances in which the activity of assembling pre-manufactured components may play so small a part in the production of the finished article that a "manufacturing" tax based on total gross receipts from sales would demonstrably result in the taxation of significant extraterritorial values, this is not such a case. All human manufacturing involves the utilization of material components whose genealogy can usually be traced to a source beyond the borders of the taxing jurisdiction in which the finished product emerges. █ It is only when the final operation yielding the finished product is inappreciable in comparison with the extraterritorial activities producing the component parts that a "manufacturing" tax based on unapportioned gross receipts may be said to reach significant extraterritorial values. █ We conclude that the automobiles here in question are "wholly manufactured" in the City within the meaning of *Carnation* and *Shell,* and the City may properly utilize the unapportioned gross receipts derived from the sale of those automobiles, wherever such sales be made, as a factor in General Motors' business privilege tax.

(2) *Wholesale sales of Chevrolets assembled at out-of-city plants and shipped to dealers within the City pursuant to orders placed at the in-city zone office.*

█ With respect to this category of transactions, we think that General Motors has sustained its burden of showing that the inclusion of *unapportioned* gross receipts within the tax base results in the taxation of significant extraterritorial values—for it clearly appears that substantial elements of the sales process which produces these receipts take place outside the City. Thus, for instance, it is undisputed that when Los Angeles dealers order through their zone office a model produced at an out-of-city plant, that

plant accepts or rejects the order, ships the vehicle, and bills the dealer or his financing institution. The City's application of Ruling 14 to this category of transactions—which purports to reach total unapportioned gross receipts solely because the vehicles are shipped into the City—is violative of the constitutional principles explained in *Shell* because it refuses to take cognizance of the out-of-city elements of the transactions.[13] The gross receipts arising from this category of transactions must be apportioned in a manner which fairly reflects the proportion of in-city to out-of-city selling activities.[14]

General Motors, not content with the requirement of apportionment as to these gross receipts, contends that it should not be subject to *any* tax at all upon sales of automobiles shipped into the City from out-of-city assembly plants.

The argument as we understand it is as follows: When we look to the business of General Motors as a whole it is clear that that business is the *manufacturing* of motor vehicles. The fact that it sells the products of its manufacturing labors does not mean that it is per se in the business of *selling,* for any manufacturer must sell his products in order to realize the profits of manufacture. Unless a manufacturer, after the production of his goods, also engages in "merchandising" activities whereby he seeks to take a dealer's profit in addition to a manufacturer's profit, he should not be taxed as a seller or merchant but only as a manufacturer. (Citing *Chattanooga Plow Company* v. *Hays* (1911) 125 Tenn. 148 [140 S.W. 1068].) Because, it is argued, General Motors does not engage in "merchandising" activities in addition to its activities of manufacturing and disposing of manufactured goods, it should not be subject to tax under L.A.M.C. sections 21.166 or 21.167 as a person engaged in selling. Rather, it should be taxed only as a manufacturer (i.e., on unapportioned gross receipts derived from

---

[13]In spite of our *Shell* decision the City continues to rely upon *General Motors* v. *Washington* (1964) 377 U.S. 436 [12 L.Ed.2d 430, 84 S.Ct. 1564] for the proposition that an unapportioned tax is proper in these circumstances. It suffices to say that *Shell,* which was based primarily upon our interpretation of provisions of the state Constitution, is controlling in this state to the extent that its requirements of apportionment are more stringent than those approved in *General Motors* v. *Washington.*

[14]We repeat at this point what we said in *Shell* relative to actual apportionment on remand. "We do not suggest that the out-of-city sales activities which we have mentioned are the only such activities which should be considered directly contributive to [the taxpayer's] gross receipts. Nor do we evaluate the relative significance of the various factors. Such matters will be the proper concern of the trial court upon remand. We here determine only that if there are substantial out-of-city sales activities which directly contribute to the gross receipts sought to be made a basis of the tax, the measure of tax must apportion those gross receipts in a manner which fairly reflects the proportion of in-city to out-of-city activities. We express no present opinion as to which specific activities of [the taxpayer] are to be considered sales activities for this purpose." (4 Cal.3d at p. 127, fn. 17.)

the sale of vehicles produced in the City—see part IV.(1) above). Indeed, the argument concludes, any other result will bring about multiple taxation: if General Motors can be taxed as a manufacturer at the point of production and a seller at the point of sale, it will be taxed on more than 100 percent of the gross receipts derived from the sale of any one vehicle, for the taxing jurisdiction at the place of manufacture can tax on the basis of 100 percent of the gross receipts under the *Carnation* principle (part IV. (1) above) and the taxing jurisdiction of the place of sale can tax on the basis of an apportionment according to selling activities there.

This contention rests upon a fundamental misconception of the tax with which we are here concerned. Indeed it is noteworthy that a virtually identical contention was made in the first *Belridge* case (*City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d 823 [271 P.2d 5]), was accepted by the Court of Appeal which concluded that the taxpayer was not engaged in "selling" within the City,[15] and was specifically rejected by this court: "There is no reason to believe that the authors of [L.A.M.C.] section 21.166 were concerned with the degree of effort or expense involved in the selling of goods nor were they concerned with whether or not selling was the dominant or incidental activity of the company. The main concern would appear to be whether or not the company was engaged in the selling of goods. The purpose of the section was to place a business license tax on those activities which took place within the city of Los Angeles regardless of their relationship to activities outside the city. [Par.] . . . There is no requirement that the seller must be in the merchandising business before the transaction can be called a sale and likewise it is not logical to attempt to narrow the meaning of the term 'selling' to include only those whose dominant business is of a merchandising nature." (42 Cal.2d at p. 829.)

The point is that the tax here in question is one levied upon those engaged in business within the City for the privilege of so engaging, and that it is measured on the basis of gross receipts which are directly attributable to the business activities which the taxpayer carries on within the City. ■ Provided that fair apportionment of gross receipts is undertaken when substantial out-of-city activities have contributed to their production, and further provided that the taxation is neither prohibitory nor confiscatory, the City is *constitutionally* free to tax the business presence within its jurisdiction by reference to the "taxable events" occurring there. (See *Fox etc. Corp.* v. *City of Bakersfield* (1950) 36 Cal.2d 136 [222 P.2d 879].) ■ Thus, we perceive no *constitutional* impediment to the City's taxing *manufacturing* within the City by reference to the total gross receipts, *handling* or *storage* within the City by reference to the same total gross receipts,

---

[15]Court of Appeal opinion reported at 260 P.2d 217.

*and selling* by reference to the same total or apportioned[16] gross receipts. This would not constitute that multiple taxation which our *Belridge* and *Shell* cases took pains to proscribe, for the possibility of duplicate taxation by another taxing jurisdiction based upon the same activity would not exist.

In view of these constitutional facts of life General Motors' rationale of multiple taxation appears to have little if any substance. ▮ The fact that the taxing jurisdiction containing an out-of-city assembly plant may include within its tax base the unapportioned gross receipts derived from the sale of a vehicle *manufactured* there cannot affect the City's constitutional power to include within its own tax base an apportioned part of the gross receipts attributable to the *selling* activity taking place within its borders.

We hasten to dispel any confusion that may arise between the outer limits of the City's constitutional power to tax and the levy which it has chosen to exact through its tax ordinance. Although as we have indicated there exists no *constitutional* limitation[17] which would preclude the City from basing its tax on selling activities as well as on manufacturing activities with respect to the same products, it is clear that the City's ordinance does not extend that far, for it bases the tax on selling activities *only* in those instances wherein the products sold are manufactured or produced elsewhere.

This is the lesson of *Universal Consolidated Oil Co.* v. *City of Los Angeles* (1962) 202 Cal.App.2d 771 [21 Cal.Rptr. 61], a case upon which General Motors lays heavy, albeit misplaced, reliance. There the taxpayer produced crude oil at well sites both within and without the City. A segment of its business tax was based on its activity as a producer of oil within the City and was measured according to L.A.M.C. section 21.124 on the basis of barrels produced from in-city wells. The City sought in addition to tax it as a wholesale seller of that oil under L.A.M.C. section 21.166. The Court of Appeal properly held that the ordinance would not permit this, for L.A.M.C. section 21.166, like the two other "catch-all" provisions in the ordinance, permits a tax upon selling *only* when the taxpayer has not been "specifically taxed by other provisions of this Article" for the production of the substance or product sold. (See fns. 3 and 4, *ante.*) Significantly, however, the Court of Appeal went on to hold that the taxpayer *could* be taxed under L.A.M.C. section 21.166 as a seller of oil produced

---

[16]That is, the *total* gross receipts if all substantial elements of the selling process take place within the City, and the *apportioned* gross receipts if they do not.

[17]Always, of course, there is the overriding limitation that a tax may not be prohibitory or confiscatory. (*Fox etc. Corp.* v. *City of Bakersfield, supra,* 36 Cal.2d 136, 139.)

at wells *outside the City* and sold through its in-city office. "It appears that the activities of plaintiff in the city with respect to oil produced from wells outside the city are substantially the same as the selling activities of Belridge Oil Company [in the *Belridge* case], wherein it was held that the company was subject to the tax imposed by section 21.166 measured by the company's selling activities in the city. In the present case, plaintiff is subject to the tax imposed by section 21.166 measured by plaintiff's activities in the city in selling oil produced from wells located *outside* the city." (202 Cal.App.2d at p. 781.)

■■■ For the foregoing reasons, we conclude that General Motors' business tax may be based upon properly apportioned gross receipts arising from sales of vehicles produced outside the City and sold to dealers within the City pursuant to orders placed at the in-city zone office.

(3) *Retail sales of GMC trucks delivered from the out-of-city retail outlet to customers within the City after in-city solicitation of orders but out-of-city (retail outlet) consummation of transactions.*

■■■ With respect to this category of transactions General Motors, in our opinion, has sustained its burden of showing that the inclusion of un-apportioned gross receipts within the tax base results in the taxation of significant extraterritorial values—for it clearly appears that substantial elements of the sales process which produces these receipts take place outside the City. Thus, for instance, it is undisputed that the sales personnel who engage in selling within the City maintain their offices at the out-of-city retail outlet; that orders are accepted and payment received at the out-of-city retail outlet; and that new vehicles are often initially delivered from the factory to the retail outlet and subsequently delivered from that point to the in-city customer. The City's application of Ruling 14 to this category of transactions—which purports to reach total *unapportioned* gross receipts solely because the vehicles are shipped into the City—is violative of the constitutional principles explained in *Shell* because it refuses to take cognizance of the out-of-city elements of the transactions. The gross receipts arising from this category of transactions must be apportioned in a manner which fairly reflects the proportion of in-city to out-of-city selling activities.

(4) *Wholesale sales of Chevrolets assembled at out-of-city plants and shipped to out-of-city dealers pursuant to orders placed at the in-city zone office.*

As indicated above, the City does *not* seek to include within General Motors' tax base the *unapportioned* gross receipts from the transactions in this category. Rather the City, applying the apportionment formula con-

tained in paragraph 1(d) of Ruling 14,[18] seeks to include only 15 percent of the total gross receipts. ▮▮▮ The taxpayer's burden in this instance is the same as that applicable when the taxing jurisdiction seeks to include total gross receipts in the tax base—to wit, the taxpayer must show by clear and cogent evidence that the application of the formula to it results in the taxation of significant extraterritorial values. (See *City of Los Angeles* v. *Moore Business Forms, Inc.* (1966) 247 Cal.App.2d 353, 361-363 [55 Cal.Rptr. 820].)

General Motors has not sustained its burden in this regard. It has not shown that the apportionment of 15 percent of its gross receipts from sales in this category does not fairly reflect that proportion of relevant selling activity which is actually carried on within the City. Its objection to this aspect of the business tax levied against it must therefore fail.[19]

## VI. DISPOSITION

The judgments are reversed and the cause is remanded to the trial court with directions to vacate its order granting defendant's motions for full summary judgment; to enter an order for partial summary judgment for defendant with respect to transaction categories (1) and (4) set forth herein; to proceed to determine a proper apportionment of plaintiff's gross receipts with respect to transaction categories (2) and (3) in conformity with the views herein expressed; and to enter judgment accordingly. Plaintiff shall recover its costs on appeal.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

Appellant's petition for a rehearing was denied July 28, 1971.

---

[18]Paragraph 1(d) of Ruling 14 is set forth in full in footnote 5 of the *Shell* opinion. (4 Cal.3d at p. 116, fn. 5.) A summary of the terms of that paragraph is set forth in the text accompanying that footnote substantially as follows: "Paragraph 1(d) . . . provides in substance that if . . . a person having . . . a place of business within the City has receipts attributable 'both to business activities based upon that place of business and business activities carried on outside the City of Los Angeles' 25 percent of the receipts resulting from the sale of goods *which are not shipped from or into the City* as provided in paragraph 1(c) [Ruling 14] shall be considered directly attributable [to in-city business] if four or more of seven specifically listed elements of the selling process take place within the City, and 15 percent of the gross receipts so derived shall be considered directly attributable if less than four of the said elements take place within the City. The seven elements are, generally speaking: negotiating or soliciting, display of samples, processing of orders, acceptance of orders, arranging for delivery, billing and collection." (4 Cal.3d at pp. 115-116.)

[19]Moreover, at oral argument General Motors expressly withdrew its objection to this aspect of the tax.