[S.F. No. 23598. May 30, 1978.]

BERESFORD DAVID WEEKES et al., Plaintiffs and Respondents, v.
CITY OF OAKLAND et al., Defendants and Appellants;
RICHARD K. GROULX et al., Interveners and Respondents.

388

**COUNSEL**

David A. Self, City Attorney, Ralph R. Kughler, Assistant City Attorney, and Douglas Dang for Defendants and Appellants.

Burt Pines, City Attorney (Los Angeles), Thomas C. Bonaventura, Assistant City Attorney, Pedro B. Echeverria and Thomas J. Theis, Deputy City Attorneys, Thomas M. O'Connor, City Attorney (San Francisco), John J. Doherty, Deputy City Attorney, William J. Adams, City Attorney (Merced), and James D. Jackson, City Attorney (Sacramento), as Amici Curiae on behalf of Defendants and Appellants.

Berkley, Vaughs, Rhodes & Sherrod, Thomas L. Berkley, Gene Rhodes and Leon H. Rountree, Jr., for Plaintiffs and Respondents.

Van Bourg, Allen, Weinberg & Roger, Van Bourg, Allen, Weinberg, Williams & Roger, Victor J. Van Bourg, Stewart Weinberg, William A. Sokol and Michael B. Roger for Interveners and Respondents.

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Gary A. Larson, Deputy Attorney General, as Amici Curiae on behalf of Interveners and Respondents.

## OPINION

**THE COURT.—** ▇ May a chartered city, in the exercise of powers conferred by the home rule provision of the California Constitution (art. XI, § 5, subd. (a)), levy upon all persons employed within the city a tax measured by the compensation received from employers, notwithstanding an express statutory prohibition against municipal taxes "upon income"? (Rev. & Tax. Code, § 17041.5; all statutory references are to that code, unless otherwise cited.) This is the issue presented to us following the City of Oakland's adoption in June 1974 of Municipal Code section 5-1.65, which provides for an "employee license fee" upon the "privilege of engaging in or following any business, trade, occupation or profession as an employee." The fee is measured by the employee's "gross receipts" for services performed in Oakland and consists generally of 1 percent of Oakland-derived earnings. (Oakland Mun. Code, § 5-1.65.) Thus, we examine the interplay of a state constitutional authorization, a statutory prohibition, and a municipal ordinance enacted by a chartered city.

Plaintiffs and interveners, all subject to the ordinance and potential taxpayers, assert that the levy, although denominated a "license fee," is essentially a municipal income tax, which has been imposed in contravention of the following express legislative prohibition of section 17041.5: "Notwithstanding any statute, ordinance, regulation, rule or decision to the contrary, no city, county, city and county, governmental subdivision, district, public and quasi-public corporation, municipal corporation, whether incorporated or not or whether chartered or not, shall levy or collect or cause to be levied or collected any tax upon the income, or any part thereof, of any person, resident or nonresident. [¶] This section shall not be construed so as to prohibit . . . any otherwise authorized license tax upon a business measured by or according to gross receipts."

The city offers in support of the ordinance essentially two arguments, the ultimate validity of which is pivotal herein: first, that the license fee is not a tax upon income but a business or occupation tax measured by gross receipts; and second, that even if it is an income tax the levy is a

legitimate exercise of a chartered city's revenue-raising power which the Legislature is without authority to prohibit.

We conclude that the fee is what it purports to be, namely, an occupation tax substantially resembling the type of municipal license fee long approved by us and expressly authorized by the final paragraph of section 17041.5. In view of our conclusion in this regard, we need not, and do not, reach the further question whether the Legislature is prevented by the home rule provision of the California Constitution from imposing an absolute ban upon revenue-raising measures of this nature enacted by chartered cities.

We briefly examine certain characteristics of the subject ordinance, and observe that it exacts an employee license fee for the privilege of engaging, within the city, in any business, trade, occupation or profession (other than that of domestic servant in a private home) *as an employee.* The fee is measured by the employee's "gross receipts" in excess of $1,625 per quarter. The ordinance defines "gross receipts" as "compensation," which includes "the total gross amount of all salaries, wages, commissions, bonuses, or other money payments of any kind or any other considerations having monetary value, which a person receives from or is entitled to receive from or be given credit for by his employer" for services rendered within the City of Oakland (Oakland Mun. Code, § 5-1.65(g).) Travel and business-expense allowances or reimbursements are excluded from gross receipts, but there is no deduction for business-related expenses. If an "employee" has an ownership interest in a business and is thereby liable for a portion of the city business license fee already imposed upon owners and operators of businesses, he is entitled to an appropriate credit against the employee license fee. Provision is made for an apportionment between compensation earned in Oakland, which is subject to tax, and compensation attributable to activities outside Oakland, which is tax exempt.

Although the employee is the actual taxpayer, the ordinance requires employers to collect the license fee by withholding tax from each employee's paycheck. The employer must remit payments to the city treasurer on a quarterly basis, but if he fails to do so, or if the license fee liability of a particular employee is not completely accounted for by withholding, the employee himself is obliged to file an annual return. The ordinance does not provide for the actual issuance of any certificate of compliance or "license," although it makes payment of the license fee a condition precedent to continued employment in the city.

It will thus be seen that any person employed in Oakland, whether a resident or nonresident, owes the city 1 percent of his Oakland-generated compensation for the privilege of earning a living there. Residents of Oakland who are employed elsewhere are not subject to the license fee.

■ In reviewing the applicable law we acknowledge, preliminarily, the long standing principle that the power to raise revenue for local purposes is not only appropriate but, indeed, absolutely vital for a municipality. (*United States* v. *New Orleans* (1878) 98 U.S. 381, 393 [25 L.Ed. 225, 226]; *Ex Parte Braun* (1903) 141 Cal. 204, 209 [74 P. 780].) Moreover, the power to tax for local purposes clearly is one of the privileges accorded chartered cities by the home rule provision of the California Constitution (Cal. Const., art. XI, § 5, subd. (a); *West Coast Adver. Co.* v. *San Francisco* (1939) 14 Cal.2d 516, 524, 526 [95 P.2d 138]; *Ex Parte Braun, supra,* 141 Cal. at pp. 211-212; *Franklin* v. *Peterson* (1948) 87 Cal.App.2d 727, 732 [197 P.2d 788].)

Thus, Oakland's right to enact a revenue-raising tax is not at issue unless the city's own charter imposes restrictions upon its taxing power (which the parties concede it does not), or the city ordinance is in direct and immediate conflict with a state statute or statutory scheme. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 62 [81 Cal.Rptr. 465, 460 P.2d 137]; *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 370 [125 P.2d 482, 147 A.L.R. 515].) Since section 17041.5 by its terms bars only a municipal tax "upon income," there exists no conflict between statute and ordinance if the license fee under examination is not a tax upon income. (Cf., *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132 [98 Cal.Rptr. 281, 490 P.2d 793].)

In the ordinance itself, the levy at issue is described as a "license fee," and the city refers to it as an "occupation" or "business" tax. ■ We have said, of course, that the legislative designation of a particular tax, though persuasive, is not determinative as to its nature. (*Ex Parte Braun, supra,* 141 Cal. 204, 206; *In re Johnson* (1920) 47 Cal.App. 465, 466 [190 P. 852]; see *Beamer* v. *Franchise Tax Board* (1977) 19 Cal.3d 467, 475 [138 Cal.Rptr. 199, 563 P.2d 238].) The character of a tax is ascertained from its incidents, not its label. (*Ainsworth* v. *Bryant* (1949) 34 Cal.2d 465, 473 [211 P.2d 564]; *Ingels* v. *Riley* (1936) 5 Cal.2d 154, 159 [53 P.2d 939, 103 A.L.R. 1].)

■ Approaching the difficult task of classification of the particular levy before us, we note first numerous differences between the license fee and the typical income tax. For example, the provision which defines

"gross income" for state income tax purposes (§ 17071, substantially identical to its federal counterpart, Int. Rev. Code, § 61), includes not only "compensation for services" and "gross income derived from business" but "interest," "rents," "royalties," "annuities," "income from discharge of indebtedness," "income from an interest in an estate or trust," and other items and sources of revenue which the Oakland tax does not purport to reach. Moreover, the traditional assessment commonly recognized as an income tax is ordinarily a tax upon net income—that is, gross income reduced by other taxes, business expenses, and costs incurred in the production of the income. The Oakland ordinance, in contrast, expressly includes, as compensation subject to the levy, sums deducted "before 'take home' pay is received" (Oakland Mun. Code, § 5-1.65(g)) and forbids deduction of business-related expenses, except that the taxpayer may claim a *credit* for any other business license tax paid to the city. The city contends, accordingly, that the "gross receipts" characteristic of the license tax, together with the availability of a credit for license fees exacted from persons with ownership interests in the business, sufficiently distinguishes the Oakland levy from an "income" assessment and evidences a distinctive, comprehensive, and coordinated business tax system.

Moreover, this tax differs in significant respects even from a conventional municipal income tax, which ordinarily is much simpler both in structure and operation than its state and federal counterparts. City income taxes, as they exist in jurisdictions which permit direct municipal taxation of income, tend to be nongraduated, proportional levies upon earned income only, generally resembling the Oakland tax. (*Legislative Developments, The Limits of Municipal Income Taxation: The Response in Ohio* (1970) 7 Harv.J.Leg. 271, 273; Januta, *The Municipal Revenue Crisis: California Problems and Possibilities* (1968) 56 Cal.L.Rev. 1525, 1555 & fn. 151; 4 Assem. Interim Com. Rep. (1964) No. 13, Financing Local Government in Cal., p. 52.) Typically, however, cities imposing income taxes seek to tax *all* earned income of city residents, whether for services rendered inside or outside the taxing jurisdiction. (See *Legislative Developments, supra*; Januta, *supra,* at pp. 1554-1555, fns. 149-150.) The ordinance before us, in contrast, measures the applicable tax only by *Oakland-derived* earnings. A traveling salesman, for example, whose income is generated by activities both inside and outside the city, will pay a license fee measured solely by income from his intracity activities, and an Oakland resident who is employed elsewhere escapes the license tax entirely. Further, the Oakland tax measured by employee earnings is correlated, by means of a tax credit, with the city's general gross receipts

business tax upon owners and employers, whereas city income tax schemes generally contain a provision for taxing the *net* earnings of business entities. (*Legislative Developments, supra*; Januta, *supra,* 56 Cal.L.Rev. at p. 1555, fn. 151; Financing Local Government, *supra,* at pp. 54-55.)

It appears, accordingly, that Oakland's license fee, though closely tied to "income or [a] part thereof" in terms of the designated *measure* of tax liability, bears no immediate, compelling resemblance to the more familiar income taxation models which section 17041.5 unquestionably purports to bar. Since the city has labeled the fee an "occupation license tax," a brief comparison of its provisions with those characteristic of the traditional business tax is instructive.

■ A business or occupation tax is usually defined as a revenue-raising levy upon the privilege of doing business within the taxing jurisdiction. (*In re Groves* (1960) 54 Cal.2d 154, 157 [4 Cal.Rptr. 844, 351 P.2d 1028]; *Ainsworth* v. *Bryant, supra,* 34 Cal.2d 465, 474; *In re Galusha* (1921) 184 Cal. 697, 699 [195 P. 406].) The tax or "license fee" is often measured by gross receipts (see *Franklin* v. *Peterson, supra,* 87 Cal.App.2d 727; *Estes* v. *City of Gadsden* (1957) 266 Ala. 166 [94 So.2d 744]; cf. § 17041.5), and payment is ordinarily a condition precedent to continued exercise of the privilege made subject to tax. (*Ingels* v. *Riley, supra,* 5 Cal.2d 154, 159.)

The *gross receipts occupation tax* has a venerable history as a revenue-raising measure for California cities. (See, e.g., *General Motors Corp.* v. *City of Los Angeles* (1971) 5 Cal.3d 229, 235, fn. 4 [95 Cal.Rptr. 635, 486 P.2d 163] [privilege of manufacturing and selling]; *City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d 823, 831 [271 P.2d 5] [privilege of engaging in the activity of selling]; *In re Nowak* (1921) 184 Cal. 701, 703 [195 P. 402] [conducting, managing and carrying on the business of retail grocer]; *In re Galusha, supra,* 184 Cal. 697, 699, and *Franklin* v. *Peterson, supra,* 87 Cal.App.2d 727, 730 [the practice of law]; *Ex Parte Braun, supra,* 141 Cal. 204, 205 [numerous professions and occupations]; *Marsh & McLennan of Cal., Inc.* v. *City of Los Angeles* (1976) 62 Cal.App.3d 108, 111, 112 [132 Cal.Rptr. 796] [any trade, calling, occupation, vocation, profession or other means of livelihood conducted or engaged in as an independent contractor].)

The Oakland tax challenged herein differs materially from most other occupation taxes heretofore reviewed and approved by us in only two

respects: (1) it is not made applicable merely to enumerated or generically identified businesses (e.g., "retail sales"), but purports to encompass all trades and professions; and (2) it reaches the individual employee, in contrast to the more typical occupation or license tax which burdens only owners and independent contractors. Seizing upon the novel features of the Oakland scheme, plaintiffs argue that a tax fastened upon the owners and sole proprietors of particular businesses, and measured by the gross receipts of those businesses, is a legitimate occupation tax; but a tax upon those persons who follow their trades or callings as employees, and measured by compensation, can be nothing but an income tax. We are not convinced that this conclusion is either necessary or logical.

The Oakland license fee, it is true, does apply to all trades, professions and callings practiced within the city, without specification or distinction. ■ Yet the power of a governmental entity to tax the privilege of engaging in any and all types of trade or business within its jurisdiction is not open to serious question. Indeed, the power to impose a reasonable privilege tax extends even to those activities which the city can neither forbid (*City of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93, 104 [308 P.2d 1]; see *Steward Machine Co.* v. *Davis* (1937) 301 U.S. 548, 578-581 [81 L.Ed. 1279, 1286-1288, 57 S.Ct. 883, 109 A.L.R. 1293]), nor regulate (*In re Groves, supra,* 54 Cal.2d 154, 156; *In re Galusha, supra,* 184 Cal. 697, 699). As expressed by the United States Supreme Court, "An excise is not limited to vocations or activities that may be prohibited altogether. It is not limited to those that are the outcome of a franchise. It extends to vocations or activities pursued as of common right." (*Steward Machine Co.* v. *Davis, supra,* at pp. 580-581 [81 L.Ed. at p. 1287].) Clearly, a single tax broad enough to include all businesses, callings and trades within its ambit is a perfectly proper business tax, and in fact the typical municipal business license tax scheme is so comprehensive that virtually all businesses are covered. (See, e.g., *Marsh & McLennan of Cal., Inc.* v. *City of Los Angeles, supra,* 62 Cal.App.3d 108, 111-112.) It does not, by virtue of its encompassing character, become an income tax.

We perceive no reason why a different principle should apply if a tax of this nature is levied upon the privilege of engaging in an occupation as an employee rather than as a proprietor or independent contractor. The traditional business tax differentiation between owners and independent contractors, on the one hand, and employees, on the other, may be, and indeed is, a reasonable distinction for tax purposes, but it is by no means a mandatory one. A taxing entity may choose to impose an excise tax only

upon attorneys, electricians and stenographers who own their businesses or operate independently, but it cannot be said that it lacks the power also to require the license fee of attorneys, electricians and stenographers who sell their services to employers. The license fee is no less a tax on the privilege of doing business in the second case than in the first. ▮ "In statutes relating to license taxes, the word 'business' means that which occupies the time, attention and labor of men for the purposes of livelihood or for profit." (*Long* v. *City of Anaheim* (1967) 255 Cal.App.2d 191, 197 [63 Cal.Rptr. 56].) Moreover, as has been said on the highest authority, "Employment is a business relation, if not itself a business. . . . The power to tax the activities and relations that constitute a calling considered as a unit is the power to tax any of them. The whole includes the parts." (*Steward Machine Co.* v. *Davis, supra,* 301 U.S. at p. 581 [81 L.Ed. at pp. 1287-1288].)

▮ As the city's right to tax the privilege of employment is virtually beyond dispute, the sole remaining issue is whether an otherwise legitimate excise tax upon that privilege is necessarily converted to an income tax simply because the tax liability is measured by employee compensation. We think not.

It has long been established that the *measure,* or *mode* of *ascertaining* a particular tax is not conclusive as to its type or nature. (*Rosemary Properties, Inc.* v. *McColgan* (1947) 29 Cal.2d 677, 681 [177 P.2d 757] [a franchise tax measured by net income is not an income tax]; *Franklin* v. *Peterson, supra,* 87 Cal.App.2d 727, 733 [a gross receipts occupation tax is not an income tax]; *Estes* v. *City of Gadsden, supra,* 94 So.2d 744, 750 [occupation tax levied upon employees and measured by compensation is not an income or property tax]; *City of Louisville* v. *Sebree* (1948) 308 Ky. 420 [214 S.W.2d 248, 253-254] [occupation tax measured by employee compensation, as to individuals, and by net profits as to businesses, is an excise, not an income tax].) In *Ingels* v. *Riley, supra,* 5 Cal.2d 154, the petitioner asserted that a vehicle license tax measured by the value of the vehicle was in effect a property tax, entitling him to a veteran's exemption. We held that "if a tax [is] in its nature a privilege tax, it does not become a property tax simply because it is proportioned in amount to the value of the property used in connection with the privilege which is taxed." (*Id.,* at p. 160.) Since the license tax was payable only if the vehicle was operated upon the public highways, we concluded that it was essentially a privilege tax. Similarly, Oakland's license fee is exacted only from persons who in fact exercise the privilege of selling their skills and services within the City of Oakland, and only to the *extent* that they do so.

Using compensation as the measure of the tax liability is a proper means of meeting constitutional requirements by scaling the tax to "the quantum of business actually done in the taxing jurisdiction." (*City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108, 124 [94 Cal.Rptr. 1, 480 P.2d 953]; *General Motors Corp.* v. *City of Los Angeles, supra,* 5 Cal.3d 229, 238-239.)

A close examination of both the purpose and the operation of the challenged ordinance does not persuade us that the license fee either in logic or necessity must be considered an income tax. Therefore, the deference due to the city's own description of its revenue-raising measure (*Ainsworth* v. *Bryant, supra,* 34 Cal.2d 465, 469; *Ingels* v. *Riley, supra,* 5 Cal.2d 154, 160) may properly be treated as an element of *some* weight favoring the conclusion that the levy is indeed an excise tax legitimately measured by employee compensation. As we have recently observed in *A.B.C. Distributing Co.* v. *City and County of San Francisco* (1975) 15 Cal.3d 566, 576 [125 Cal.Rptr. 465, 542 P.2d 625], "[A]ll taxes necessarily involve some reduction of and relationship to available revenues." This particular privilege tax is related, and properly so, to the compensation derived from exercise of the burdened privilege, and that compensation will of course be reduced by payment of the tax. But the essential fact, for our present purpose, is that it is the privilege, not the income generated by its exercise, that is the direct and immediate subject of the tax. (See *City of Louisville* v. *Sebree, supra,* 214 S.W.2d 248, 253-254.)

We note finally that any remaining doubt as to the compatibility of Oakland City Ordinance No. 9021 with section 17041.5 is resolved by a brief perusal of Government Code section 50026. This latter provision, enacted five years after the statute barring municipal income taxes, prohibits any local entity otherwise entitled to enact a tax "on the privilege of earning a livelihood by an employee . . . on or measured by the earnings, or any part thereof," from imposing such a tax upon employees who are not residents of the taxing jurisdiction, "unless exactly the same tax . . . with the same credits and deductions, is imposed on the earnings of all residents of the taxing jurisdiction who are employed therein." The Government Code section expressly cautions that it is "not [to] be construed as authorizing any tax prohibited by Section 17041.5 of the Revenue and Taxation Code." ■ Nevertheless, Government Code section 50026, which plainly bars *discriminatory* municipal occupation taxes measured by employee compensation, is pointless and redundant if section 17041.5 is construed as enjoining *all* municipal occupation taxes measured by employee compensation, on the theory that they are

necessarily income taxes. We have traditionally been reluctant to interpret a statute in such a way as to render it, or another existing provision, unnecessary. (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081]; *People* v. *Gilbert* (1969) 1 Cal.3d 475, 480 [82 Cal.Rptr. 724, 462 P.2d 580]; *Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 647 [335 P.2d 672].) We see no reason either to avoid or to ignore application of that principle here.

■ For all of the foregoing reasons, we hold that section 17041.5 prohibiting municipal taxes "upon income" is not in conflict with, and does not bar the operation of, Oakland's employee license fee.

■ ■ We also conclude that the City of Oakland is not barred from imposing its license tax upon state employees who work within the city (cf. *Graves* v. *N. Y.* ex rel. *O'Keefe* (1939) 306 U.S. 466, 486-487 [83 L.Ed. 927, 936-937, 59 S.Ct. 595, 120 A.L.R. 1466]); nor does the tax discriminate unreasonably against Oakland residents who are employed in the city, merely because residents employed elsewhere are exempt. A governmental entity has broad power to classify for tax purposes (*Fox etc. Corp.* v. *City of Bakersfield* (1950) 36 Cal.2d 136, 141 [222 P.2d 879]; see *Lehnhausen* v. *Lake Shore Auto Parts Co.* (1973) 410 U.S. 356, 359 [35 L.Ed.2d 351, 354-355, 93 S.Ct. 1001]), and in matters of taxation, the ". . . test is . . . whether the taxing power exerted . . . bears fiscal relation to protection, opportunities and benefits given . . . ." (*Wisconsin* v. *J. C. Penney Co.* (1940) 311 U.S. 435, 444 [85 L.Ed. 267, 270, 61 S.Ct. 246, 130 A.L.R. 1229].) The privilege of engaging in a trade, employment, or calling within a municipality is a nexus with the city sufficiently distinct from residence therein to justify separate tax treatment in this instance.

The judgment is reversed.

**RICHARDSON, J.**—I concur. Although the case properly may be disposed of on the basis that the Oakland license tax is not an income tax, I would uphold the tax upon the additional ground that, in any event, the Legislature lacks power to proscribe municipal income taxes. I would reach and resolve the constitutional issue which the parties have raised in view of the unquestionable importance of this matter to numerous California cities. Additionally, a speedy resolution of the constitutional question is suggested by the need for judicial economy and the likelihood of future litigation over novel municipal levies that are business taxes by designation but arguably are disguised income taxes statutorily prohibit-

ed by Revenue and Taxation Code section 17041.5 (all statutory references are to that code unless otherwise indicated).

Stated concisely, that issue is whether the enactment of a revenue-raising tax based upon the income of persons within a city's jurisdictional reach is a municipal affair, insulated from legislative interference by article XI, section 5, subdivision (a), of the California Constitution.

Since 1879, California cities of designated population have had the power to adopt charters for local government (Cal. Const., art. XI, §§ 6, 8 (1879)), but it was not until 1896 that they acquired supremacy over local matters by virtue of a constitutional amendment which provided that "*except in municipal affairs,* [city charters] shall be subject to and controlled by general laws." (Cal. Const., art. XI, § 6 (1896), italics added.) This constitutional provision, commonly known as the "home rule amendment," presently reads, in part: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution . . . with respect to municipal affairs shall supersede all laws inconsistent therewith." (Cal. Const., art. XI, § 5, subd. (a).)

The home rule provision, as it has existed in various forms and phrasings since 1896, is best construed as accomplishing two purposes: (1) it *grants* to chartered cities the authority to manage local affairs; and (2) it imposes a corresponding *restriction* upon the power of the state Legislature to interfere with or override decisions on municipal matters made at the local level. (Sato, *"Municipal Affairs" in California* (1972) 60 Cal.L.Rev. 1055, 1057, 1060; Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts* (1964) 48 Minn.L.Rev. 643, 648; cf., Januta, *The Municipal Revenue Crisis: California Problems and Possibilities* (1968) 56 Cal.L.Rev. 1525, 1547, fn. 119.) We have consistently so held. As we stated many years ago, "it has always been conceded . . . that the object of the [1896 amendment and its successors] . . . was to secure to the municipality that had, under the provisions of the constitution, adopted a charter for its own government, the maintenance of its charter provisions in municipal matters, and to deprive the legislature of the power, by laws general in form, to interfere in the government and management of the municipality." (*Ex Parte Braun* (1903) 141 Cal. 204, 209 [74 P. 780].)

"On the other hand," we observed in *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 291 [32 Cal.Rptr. 830, 384 P.2d 158], "the clear language of the constitutional provisions . . . deny to the state Legislature the right to interfere with a chartered city only with respect to matters which are exclusively municipal affairs." More recently we noted that "[a]s to matters which are of statewide concern . . . home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters, if it is the intent and purpose of such general laws to occupy the field to the exclusion of municipal regulation . . . ." (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 61-62 [81 Cal.Rptr. 465, 460 P.2d 137].) Thus, "When it appears that a municipal regulation [of a chartered city] and a general state law are in conflict, the controlling law will depend on whether the subject matter is a municipal affair or whether it is of statewide concern. If the matter is a municipal affair, local ordinances and regulations will be upheld despite conflict with the general state laws . . . ." (*City of Santa Clara* v. *Von Raesfeld* (1970) 3 Cal.3d 239, 245 [90 Cal.Rptr. 8, 474 P.2d 976].)

It is conceded that taxation for local purposes is one of the powers conferred by direct constitutional grant under article XI, section 5 (*West Coast Adver. Co.* v. *San Francisco* (1939) 14 Cal.2d 516, 524, 526 [95 P.2d 138]), and that such power, generally speaking, is very broad. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 74 [37 Cal.Rptr. 74, 389 P.2d 538]; cf. *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 147 [82 P.2d 434, 126 A.L.R. 838].) Municipal taxing power, however, like all powers granted by the home rule provision, is not unlimited but may be circumscribed or abrogated (1) by self-limitations contained within a city's own charter; (2) by other constitutional provisions reserving various powers over taxation to the state; and (3) by the limitations inherent in the concept of "municipal affairs."

Section 17041.5 purports to forbid any California city, chartered or not, to impose an income tax. Assuming for purposes of discussion that the Oakland employee license fee must be considered an income tax in direct conflict with that provision, plaintiffs contend that the state statute must prevail for two reasons. The power to levy an income tax, they assert, is expressly reserved to the Legislature by article XIII, sections 26, subdivision (a), and 33, thereby rendering paramount legislative expressions on the subject. Alternatively, it is argued that enactment by California cities of a series of individual, uncoordinated local income taxes would have such a severe impact at the state level upon the mobility of California citizens, the location of commercial enterprises, and the

operation of the state income tax system that municipal income taxation must, for practical purposes, be deemed a "matter of statewide concern," and not a "municipal affair." I examine each of these contentions.

### 1. *Reservation of Power Under Article XIII*

Article XIII, section 26, subdivision (a), of the Constitution provides as follows: "Taxes on or measured by income may be imposed on persons, corporations, or other entities *as prescribed by law*." (Italics added.) Section 33 states, "The Legislature shall pass all laws necessary to carry out the provisions of this article."

Although article XIII deals expressly with income taxation, and the broad grant of the home rule amendment does so only by implication, the traditional rule that specific constitutional provisions govern more general provisions is applicable only if section 26 is indeed specific on the precise point at issue: the identity of the governmental entities entitled to levy taxes upon income. Focusing upon the phrase "as prescribed by law" in section 26, and the specific reference to the Legislature in section 33, plaintiffs maintain that the two provisions, in combination, indicate a constitutional purpose that the power to impose income taxes shall rest exclusively with the state. I do not agree.

We have previously held that "Where the power of taxation has been lodged [by constitutional provision] in the state to the exclusion of municipalities and other entities of that character, it has customarily been done by specific language expressive of such a purpose" (*Ainsworth* v. *Bryant* (1949) 34 Cal.2d 465, 472 [211 P.2d 564]), and that even constitutional provisions which clearly are reservations of taxing power should be strictly construed, and read as limiting the scope of the power being withdrawn from local entities. (*Id.,* at pp. 472-473.) The Constitution contains several examples of such explicit reservations. (E.g., Cal. Const., art. XIII, §§ 27 [state tax upon banks is in lieu of all local taxes, with specified exceptions], and 28 [state has sole power to tax insurance companies, with specified exceptions]; art. XX, § 22 [state has sole authority to license and regulate sale or purchase of alcoholic beverages].)

In contrast, the provisions cited by plaintiffs are notably and undeniably vague. Section 26, subdivision (a), does not specify *who* may levy income taxes, and section 33 can hardly be deemed a clarification, since it obviously was intended simply as an enabling clause to permit the Legislature to enact such laws as might be necessary to implement those

numerous permissive provisions of article XIII which are not self-executing.

It is true that the available legislative history tends to indicate that when the initial version of section 26 was adopted, its supporters were concerned solely with the power of the *state* to levy income taxes. One delegate to the constitutional convention explained during the debate over the section, "It is a question among the lawyers of this Convention whether, if it is not declared in this Constitution, that the Legislature has power to impose such a tax—whether it would have such a power. The reasons given are that the various taxes will be enumerated in this Constitution which the Legislature shall impose, and this being left out, the argument will be that they have no right to impose any other taxes than those enumerated in the Constitution." (2 Debates and Proceedings, Cal. Const. Convention 1878-1879, p. 947 (remarks of Mr. Ayers).) It will be noted that reference is explicitly to the Legislature, and given the prevailing theory that local entities possessed only those powers delegated by the sovereign state, the independent power of a municipality to enact an income tax could hardly have been at issue. (Januta, *The Municipal Revenue Crisis: California Problems and Possibilities, supra,* 56 Cal.L.Rev. at pp. 1541-1543; Sato, *"Municipal Affairs" in California, supra,* 60 Cal.L.Rev. at p. 1104, fn. 190; but see Comment, *The Municipal Income Tax and State Preemption in California* (1971) 11 Santa Clara Law. 343, 350-353.)

It need not follow, however, that the section was intended to, or does, vest in the Legislature alone the power to tax income. The purpose of the income tax provision in section 26 was to establish the legitimacy of the income tax as a permissible levy. In addition to the enumerated powers problem discerned by Mr. Ayers, there was potential difficulty in the fact that an income tax was widely regarded as a species of property tax. (See *Pollock* v. *Farmers' Loan & Trust Co.* (1895) 157 U.S. 429, 579 [39 L.Ed. 759, 818, 15 S.Ct. 673], affd. in part on rehg. 158 U.S. 601, 627-629 [39 L.Ed. 1108, 1122-1123, 15 S.Ct. 912].) Since the California Constitution, like most state constitutions, provided for uniform taxation of property in proportion to value (Cal. Const., art. XIII, § 1), a graduated income tax, or an income tax providing for certain exemptions for particular classes, would have been subject to challenge on constitutional grounds. (Traynor & Keesling, *The Scope and Nature of the California Income Tax* (1936) 24 Cal.L.Rev. 493, 502-506.) To assure the availability of a mode of taxation more equitable than the uniform property tax, the convention prudently removed any potential constitutional barrier by differentiating the two

taxes, property and income, and expressly approving the more flexible income tax. (2 Debates and Proceedings, Cal. Const. Convention, *supra,* at p. 945; see also, 3 *id.,* at p. 1325.)

With the adoption of the home rule amendment 17 years later, in 1896, chartered cities choosing to take advantage of the grant acquired, with respect to local matters, "a power of taxation . . . concurrent with, not dependent upon, the state Legislature." (Comment, *The Municipal Income Tax and State Preemption in California, supra,* 11 Santa Clara Law. at p. 352; see *Ex Parte Braun, supra,* 141 Cal. 204, 211-212.) The legislative history and the language of section 26 neither mandate nor support a conclusion that the power to tax income for local purposes was excluded from the bundle of municipal taxing and regulatory powers which were granted to cities by article XI, section 5. That an income tax may be imposed, by the terms of section 26, only "as prescribed by law" indicates simply that the provision is not self-executing, and although the term "law" generally refers to state statutes, as distinguished from city "ordinances," that usage is not inflexible. (See, e.g., *Rothschild* v. *Bantel* (1907) 152 Cal. 5, 9 [91 P. 803] ["law," in constitutional provision, can refer to provisions of a city charter as well as state statutes]; *In re Johnson* (1920) 47 Cal.App. 465, 467 [190 P. 852] ["law," in state statute, includes city ordinance]. Until 1974, the home rule amendment itself referred to municipal "laws and regulations." See Cal. Const. Revision Com., Proposed Revision (1968) p. 59.)

Consequently, I would conclude that the power to enact an income tax is not reserved exclusively to the state Legislature by article XIII, sections 33 and 26, subdivision (a).

The inquiry should not, however, terminate at this point. Even if the power to tax income is not constitutionally reserved, the Legislature may appropriate that power to itself by statute unless a city income tax is a "municipal affair" within the meaning of article XI, section 5, subdivision (a), the home rule provision of the Constitution. On matters of statewide concern, statutes adopted by the Legislature are supreme, superseding all conflicting municipal ordinances. Is imposition of a local income tax properly a municipal affair?

### 2. *"Municipal Affairs"*

The California Legislature first adopted a comprehensive state income tax system in 1935. (Stats. 1935, ch. 329, p. 1090 et seq.) With the 1963

enactment of section 17041.5 proscribing local taxes "upon the income ... of any person," it clearly expressed its intent to preempt the field of income taxation. The city, however, contends that the Legislature has no authority to prevent chartered cities from enacting a local tax measure designed to raise revenue for municipal purposes. I agree.

Since the adoption of the home rule amendment in 1896, the courts of this state have grappled with the definition of "municipal affair" within the meaning of article XI, section 5. The exact scope of the term is of great significance, because we have said that a "city which [has] adopted ... 'home rule' ... thereby [has] gained exemption, *with respect to its municipal affairs,* from the 'conflict with general laws' restrictions of [section 5] ... of article XI. [¶] As to matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters, if it is the intent and purpose of such general laws to occupy the field to the exclusion of municipal regulation ...." (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 61-62, italics added.)

Expressing the precise contours of the foregoing concept is essentially a matter of allocating power among competing governmental entities, and it is a duty confided to the courts alone. (*Id.,* at p. 63; *City of Santa Clara* v. *Von Raesfeld, supra,* 3 Cal.3d 239, 246.) With "no alternative but to accept the invitation," and "[w]ithout the benefit of guidance from history, constitutional tradition, or sharply delineated principle," (Sandalow, *The Limits of Municipal Power Under Home Rule: A Role for the Courts, supra,* 48 Minn.L.Rev. at p. 661), we soon concluded that "[n]o exact definition of the term 'municipal affairs' can be formulated," and have perforce been content to "give it meaning in each controverted case." (*Butterworth* v. *Boyd, supra,* 12 Cal.2d 140, 147.)

Over the past 80 years, numerous subjects and activities have been found *not* to be "municipal affairs," and certain examples may be revealing. (E.g., *Baron* v. *City of Los Angeles* (1970) 2 Cal.3d 535 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036] [city lobbyists regulation, insofar as it impinges upon state regulation of the practice of law]; *City of Santa Clara* v. *Von Raesfeld, supra,* 3 Cal.3d 239 [intercity water pollution control project and its funding procedure]; *Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d 276 [organizational rights of city employees]; *Pipoly* v. *Benson* (1942) 20 Cal.2d 366 [125 P.2d 482, 147 A.L.R. 515] [regulation of highway traffic passing through city streets]; *Bay Cities Transit Co.* v. *Los Angeles* (1940) 16 Cal.2d 772 [108 P.2d 435]

[regulation of interurban transportation system]; *Young* v. *Superior Court* (1932) 216 Cal. 512 [15 P.2d 163] [public improvement project extending beyond city limit]; *CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306 [118 Cal.Rptr. 315] [regional land use planning]; *Wilson* v. *City of San Bernardino* (1960) 186 Cal.App.2d 603 [9 Cal.Rptr. 431] [highway development]; *County of San Mateo* v. *City Council* (1959) 168 Cal.App.2d 220 [335 P.2d 1013] [annexation procedures]; cf., *Century Plaza Hotel Co.* v. *City of Los Angeles* (1970) 7 Cal.App.3d 616 [87 Cal.Rptr. 166] [taxation/regulation of alcohol].)

With the possible exception of *Century Plaza, supra,* all of these decisions involved activities which were essentially *regulatory* in nature. On the specific issue of taxation for revenue only, numerous cases declare without equivocation or qualification that "the power of municipal corporations operating under a freeholder's charter to impose taxes for revenue purposes is strictly a municipal activity authorized by the state Constitution and subject only to those limitations appearing in the Constitution or the charter itself." (*A.B.C. Distributing Co.* v. *City and County of San Francisco* (1975) 15 Cal.3d 566, 571 [125 Cal.Rptr. 465, 542 P.2d 625]; accord *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, 74; *City of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93, 99 [308 P.2d 1]; *Ainsworth* v. *Bryant, supra,* 34 Cal.2d 465, 469; *West Coast Adver. Co.* v. *San Francisco, supra,* 14 Cal.2d 516, 524; *Ex Parte Helm* (1904) 143 Cal. 553, 557 [77 P. 453]; *Ex Parte Braun, supra,* 141 Cal. 204, 211-212; *Franklin* v. *Peterson* (1948) 87 Cal.App.2d 727, 732 [197 P.2d 788].) Indeed, the only case I have found which hints at any erosion of this principle is *Century Plaza, supra,* 7 Cal.App.3d 616, a decision which "relied upon the interrelationship of certain constitutional and statutory provisions" peculiar to that case, and seems to have turned upon the inherently regulatory effect of any tax on the sale or purchase of alcoholic beverages. (See *Rivera* v. *City of Fresno* (1971) 6 Cal.3d 132, at p. 140 [98 Cal.Rptr. 281, 490 P.2d 793].)

Past adherence to the principle of local autonomy in tax matters, however, is neither conclusive nor dispositive as to the issue before us. Matters once entirely local in nature may, in a society rapidly increasing in both complexity and interdependence, lose their "strictly local" character and become "matters of statewide concern." (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63; *City of Santa Clara* v. *Von Raesfeld, supra,* 3 Cal.3d 239, 246; *Pacific Tel. & Tel. Co.* v. *City & County of S. F.* (1959) 51 Cal.2d 766 [336 P.2d 514]; *CEEED* v. *California Coastal Zone Conservation Com., supra,* 43 Cal.App.3d 306, 321.) Plaintiffs argue that

the unprecedented mobility of contemporary society, the prevalence of the commuter who works in one community while maintaining his home in another, and the growing disposition of businesses to treat local tax burdens as a key factor in location decisions will all combine to spread, distort and magnify the effect of a local income tax, necessarily producing considerable impact at the state level. The Legislature, it is asserted, has a significant interest in preventing the emergence of a series of separate and competitive "economic enclaves" with varying tax rates and overlapping jurisdictions.

We have on occasion suggested that to be a "municipal affair," a particular matter must be "solely" or "exclusively" of local interest. (See *Professional Fire Fighters, Inc.* v. *City of Los Angeles, supra,* 60 Cal.2d 276, 291.) Literal application of that standard would compel termination of the present inquiry at this point, for it certainly cannot be said that the state interests urged herein are wholly fictitious. Judicial characterization of a particular matter as either a "municipal affair" or "of statewide concern," however, has always and necessarily been less a practical description of raw fact than a legal conclusion. The briefest reflection will confirm that virtually anything touching upon the welfare and management of a municipality will also be of some concern to the state. (See *Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 67-69, dis. opn. of Peters, J.) But article XI, section 5, by committing one class of affairs to local government and the other to the Legislature, compels a dichotomy when state and local enactments conflict. Classification, then, is unavoidable; how is it to be accomplished?

In *Bishop,* we stated quite plainly that the Legislature may not arrogate to itself a particular area of activity merely by asserting an interest. (*Id.,* at p. 63.) That course would "return us to the time of the pre-1896 constitution when all general laws prevailed over charter provisions . . . . The only virtue of [such an approach] . . . is the ease of resolving the problem, but this would be accomplished at the expense of historical development and the clear import of the constitution." (Sato, "*Municipal Affairs*" *in California, supra,* 60 Cal.L.Rev., at pp. 1074-1075.) Our examination cannot cease once some legitimate but perhaps tenuous or overly broad state interest has been identified. If the home rule provision is not to be excised from the Constitution virtually at the will of the Legislature, as we have said it is not, then the only reasonable and practicable means of distinguishing matters committed to local control from areas in which the Legislature is free to assert supremacy is to weigh, in each case, the city's interest against the state's need to require

uniformity, or to prohibit, control or coordinate the extraterritorial impact of the challenged municipal activity. (See Sato, *supra,* at pp. 1072-1076; 2 McQuillin, Municipal Corporations (1966) §§ 4.85, 4.87, pp. 164, 166.)

Applying this principle to the case before us, we must acknowledge that the Legislature's attempt to appropriate the field of income taxation is certainly an indication of the seriousness with which it views the potential statewide impact of local income taxes. (Cf. Stats. 1968, ch. 559, § 3, pp. 1226-1227, declaring the mobility of California citizens a matter of statewide interest, insofar as it may be affected by "discriminatory" local taxes.) However, the Legislature's evaluation is not conclusive (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63), and in the present instance I am not persuaded that the problems potentially generated by municipal income taxes are so sweeping that they can be resolved by nothing less than an absolute proscription of this type of tax.

Plaintiffs contend with some force that municipal income taxes, particularly a network of municipal income taxes that vary in their structure and comprehensiveness from city to city, pose the very real danger of unfair distribution of tax burdens flowing from the commuter situation. While it undoubtedly is true that the raising of revenue for municipal purposes is a vital and traditional local concern, it is equally indisputable that the state has a right to prevent what one commentator has described as the exportation of "spillover costs," whether those costs be measured in money or otherwise. (Sato, *supra,* 60 Cal.L.Rev. at pp. 1074-1075.) When a local tax measure threatens serious extraterritorial effects, those consequences rise to the level of a substantial state concern, and the Legislature may properly assert its supremacy to prevent or minimize them. But the sweep of the state's protective measures may be no broader than its interest.

Here, it is the "spillover" effect, not the local revenue ordinance itself, that is the proper concern of the Legislature. If a number of sister cities follow Oakland's lead, it is perhaps conceivable that the resulting network of uncoordinated local income taxes might cause such a heavy impact upon the ubiquitous California commuter as to impede intermunicipal business activities. None of the recitation of facts or arguments presented to us, however, suggests that such external difficulties, present or potential, cannot be adequately controlled by means less stringent and intrusive than total prohibition. For example, there is available a mandatory credit and allocation system comparable to provisions of the

Bradley-Burns Uniform Local Sales and Use Tax Law. (§§ 7200-7209; see also *Legislative Developments, The Limits of Municipal Income Taxation: The Response in Ohio* (1970) 7 Harv.J.Leg. 271; Sato, *supra,* 60 Cal.L.Rev. at pp. 1101, 1103-1104.) I note in passing that the terms of the Bradley-Burns Act, which now purport to preempt the field of local sales and use taxes (§ 7203.5, added by Stats. 1968, ch. 1265, § 1, p. 2388), do not dictate the absolute uniformity claimed to be essential with respect to local income taxes. Any local entity enacting a sales tax must adopt a standard percentage rate; the decision to tax, however, is not compelled. Theoretically, a particular city and the county in which it is located could choose to forego that source of revenue and so create a substantial imbalance with respect to neighboring counties and municipalities levying the tax. It may be assumed that such eventuality was thought unlikely, but apparently the possibility was not considered intolerable.

Similarly, it is urged that businesses may be heavily influenced by the existence or nonexistence of a local income tax; however, the variation in total tax burden created by differences in local property, special district and business taxes has approximately the same effect at present. I am not persuaded that this danger so expands the state interest as to justify a flat prohibition of the city tax. Nor can I discern any potential impact upon the state income tax system, except insofar as the addition of local income tax liability increases the citizens' overall burden. However, an increase in property and business taxes, the traditional resort of financially troubled local governments, would have the same result.

Although I hasten to acknowledge that neither the economic wisdom nor the social propriety of a municipal tax measured by "income" lies within our purview, I cannot say that the mere existence of a tax such as the Oakland employee license fee threatens to disrupt a state legislative scheme or produce serious *and uncontrollable* adverse consequences outside the bounds of the taxing jurisdiction. Accordingly, an absolute prohibition of a particular type of revenue-raising tax is neither warranted nor tolerable under the home rule doctrine. (See Januta, *supra,* 56 Cal.L.Rev. at p. 1547; Sato, *supra,* 60 Cal.L.Rev. at pp. 1076, 1101, 1104; Comment, *The Municipal Income Tax and State Preemption in California, supra,* 11 Santa Clara Law. at pp. 348-349.)

The foregoing analysis is not novel. The case of *In re Groves* (1960) 54 Cal.2d 154 [4 Cal.Rptr. 844, 351 P.2d 1028], for instance, involved a municipal occupation tax upon a business subject to an elaborate system of state regulation. We held that even when a state interest in a particular

type of enterprise is extensive enough to justify preemption of regulation, a city revenue-raising tax upon that business is perfectly permissible. (See also *In re Galusha* (1921) 184 Cal. 697 [195 P. 406]; cf. *Rivera* v. *City of Fresno, supra,* 6 Cal.3d 132.) As long as the Legislature retains reasonable control over those features of the matter which are its legitimate concern, local governments remain free to exercise their legitimate and independent powers as to the local aspects.

Clark, J., concurred.

**MOSK, J.**—I dissent.

Although titled an "Employee License Fee Ordinance" the tax involved here is measured by a percentage of the gross income of all employees in Oakland. Thus this measure will have the dubious distinction of being the first municipal tax on the gross income of employees in the State of California, despite the clearly expressed intent of the Legislature that the state, and the state alone, may impose a tax based on income. (Rev. & Tax. Code, § 17041.5.) Of one thing we can be certain: it will not be the last. No unusual prescience is needed, in this day of city treasury thirst, to foresee similar income taxes imposed in most California cities. Thus employees will be subjected to three income tax bites into their one income: federal, state and municipal.

After their scholarly discussion of numerous cases and analogies the majority reach the remarkable conclusion that a tax on income is not an income tax. My views on the subject are less imaginative: since the burden of the tax is on the income of employees and not upon the receipts of a business, the ordinance does not create a license fee but an income tax.

The tax here is imposed upon the salary or compensation received by employees for services, fees and commissions, the very definition of gross income contained in Revenue and Taxation Code section 17071, subdivision (a)(1). It is rare for the Legislature to prohibit municipal action; yet it has done so in this instance with unusual emphasis. "Notwithstanding any statute, ordinance, regulation, rule or decision to the contrary," declared the Legislature in 1963 and 1965, "no city . . . whether chartered or not, shall levy or collect . . . any tax upon the income, or any part thereof, of any person, resident or non-resident." (Rev. & Tax. Code, § 17041.5.) Legislative intent has seldom been expressed more clearly.

The Legislature then added to the section that it "shall not be construed so as to prohibit the levy or collection of any otherwise authorized license tax upon a business measured by or according to gross receipts." In short, our legislators advised the cities they could use business receipts as a tax measure, but not employee income. Obviously this ordinance does not qualify for the exemption because it is not based upon the gross receipts of the business. The "performance of service by an individual as an employee" is excluded from the definition of a "business." (See 26 U.S.C. § 1402(c)(2) & (3).)

I am unimpressed by the constitutional argument raised by the city. Authority for the Legislature to retain the exclusive right to impose income taxes is contained in the state Constitution. Article XIII, section 26, permits imposition of income taxes and article XIII, section 33, authorizes the Legislature to "pass all laws necessary to carry out the provisions of this article." It is elementary that if home rule rights of chartered cities conflict with constitutionally bestowed authority of the State of California and its Legislature, the latter will prevail.

I would affirm the judgment of the trial court.

**THOMPSON (Homer B.), J.***—I dissent.

ISSUES

This case presents the following questions: (1) whether the tax enacted by the City of Oakland is an "income tax" or a "license tax"; and, (2) assuming that the subject tax is found to be an "income tax," whether a chartered city may, in the exercise of powers conferred by the home rule provisions of the California Constitution (art. XI, § 5, subd. (a)), levy such a tax.

The majority holds that the tax in question is ". . . an occupation tax substantially resembling the type of municipal license fee long approved by . . ." this court, and specifically, in the language of the last paragraph of Revenue and Taxation Code section 17041.5, a "license tax upon a business measured by or according to gross receipts." (*Ante*, p. 390.) Since finding the tax in issue a license tax was dispositive, the majority concluded that it need not address the constitutional issue.

*Assigned by the Chairperson of the Judicial Council.

I respectfully conclude that: (1) the tax enacted by the City of Oakland is an "income tax"; and, (2) a chartered city may not, in the exercise of powers conferred by the home rule provisions of the Constitution, levy such a tax.

It has been observed that one's point of view often depends upon one's viewpoint. The perspective from which an issue is viewed may affect its understanding. Approaching the questions here presented without an examination of the context in which they arose, is to meet the issues before us with "blinders." Problems of the law are not always effectively resolved by word labels or dictionary definitions. Therefore, let us first examine the events which preceded the enactment of Ordinance No. 9021, adding section 5-1.65 to chapter 5, article 1, of the Oakland Municipal Code on June 13, 1974.

BACKGROUND

A. Revenue Crisis

The 1960's brought a revenue crisis to California cities. Factors contributing to the crisis included expanding population with increased urbanization; demand for expanded municipal services; increased cost of services resulting from inflation; and social and economic patterns of growth extending outside political boundaries. An example of the last problem was the growth of large numbers of nonresident commuters. (Januta, *The Municipal Revenue Crisis: California Problems and Possibilities* (1968) 56 Cal.L.Rev. 1525, 1526.) By 1965 it was evident that competition for tax dollars had increased inter-city tax conflicts. (Sato, *Municipal Occupation Taxes in California: The Authority to Levy Taxes and the Burden on Intrastate Commerce* (1965) 53 Cal.L.Rev. 801.)

The largest source of revenue for California cities was the property tax. (Januta, *supra,* 56 Cal.L.Rev. at p. 1526 & fn. 6.) However, there was great dissatisfaction with the property tax. It was under attack as unfair, disruptive of economic activity, and difficult to administer. It was also thought to be reaching its economic and political limit. (Januta, *supra,* pp. 1528-1540.)

By 1968, one solution advanced to meet California's city revenue problem was adoption of a municipal income tax. (Januta, *supra,* pp. 1540-1558.) Cities in other states had turned to the municipal income tax as one alternative. At that time at least 170 cities outside California

were employing an income tax. (*Legislative Developments, The Limits of Municipal Income Taxation: The Response in Ohio* (1970) 7 Harv.J.Legis. 271.) It had proven easy to administer and capable of raising substantial revenues. (Januta, *supra,* 56 Cal.L.Rev. 1525.)

Why had no California City, prior to 1968, enacted a municipal income tax? The state had expressly prohibited all California cities from levying a local income tax: "Notwithstanding any statute, ordinance, regulation, rule or decision to the contrary, no city, . . . whether chartered or not, shall levy or collect or cause to be levied or collected any tax upon the income, or any part thereof, of any person, resident or nonresident." (Rev. & Tax. Code, § 17041.5.) The effect of this prohibition will be considered more fully in our subsequent discussion. Its existence, however, explains why California cities were deterred from enacting income tax measures prior to 1968. (Januta, *supra.*)

Was there any exception to this prohibition? The second paragraph of section 17041.5 contained the following provision: "This section shall not be construed so as to prohibit the levy or collection of any otherwise authorized *license tax upon a business measured by or according to gross receipts.*" (Italics added.)

B. San Francisco Tax

It was out of this milieu that the City and County of San Francisco, on August 19, 1968, enacted ordinance 246-68, the preamble of which provided in part: "An Ordinance Providing For The Imposition Of License Fees For The Privilege Of Engaging In Occupations, Trades And Professions In . . . San Francisco By All Non-Resident Persons Employed By Others . . . ." (Comment, *The Validity of San Francisco's Commuter Tax* (1969) 20 Hastings L.J. 813, fn. 1.) The ordinance imposed a tax of 1 percent upon the gross income earned by nonresidents in San Francisco. Note the language: "license fees shall be measured by one percent (.01) of the *gross receipts* of each such person . . . ." (*Id.,* at fn. 2.) The measure of the tax was wages and salaries which would normally be termed "gross income." The implementing provisions included apportionment and employer withholding. (*Id.,* at fn. 3.) This tax was popularly referred to as the "commuter tax." (*Id.*) San Francisco authorities argued commuters exploited city residents. However, a contrary argument may be made. (Sato, *"Municipal Affairs" in California* (1972) 60 Cal.L.Rev. pp. 1105, 1106, fns. 193, 199.)

The reaction of surrounding bay area counties was strong and swift. On September 13, 1968, the counties of Alameda, Contra Costa, Marin, San Mateo, and Santa Clara filed an action in the County of Sonoma seeking to enjoin the San Francisco ordinance and for declaratory relief. One of the arguments advanced in the trial court was that the San Francisco tax was an "income tax" imposed under the guise of a "license tax," and hence invalid. (20 Hastings L.J. 813, *supra,* at p. 819, fn. 49.)

At the very time the San Francisco ordinance was under consideration, the Legislature, at the behest of legislators from surrounding cities (Januta, *supra,* 56 Cal.L.Rev. at p. 1550), was acting forcefully and quickly to outlaw such taxes by adopting Government Code section 50026, which provides as follows: "The legislative body of any local agency, chartered or general law, which is otherwise authorized by law or charter to impose any tax on the privilege of earning a livelihood by an employee or any other tax, fee or charge on or measured by the earnings, or any part thereof, of any employee, shall not impose any such tax, fee or charge on the earnings of any employee, when such employee is not a resident of the taxing jurisdiction, unless exactly the same tax, fee or charge at the same rate, with the same credits and deductions, is imposed on the earnings of all residents of the taxing jurisdiction who are employed therein." (Added by Stats. 1968, ch. 559, § 1, p. 1225.)

Thus, the Legislature, faced with the San Francisco tax proposal, prohibited enactment of "commuter tax" measures, such as that adopted by San Francisco. Was the Legislature, by the language employed, inferring that it approved a ". . . tax, fee or charge on or measured by the earnings, or any part thereof, of any employee . . ." contrary to the prohibition of Revenue and Taxation Code section 17041.5? This question is more fully answered in our subsequent discussion. Suffice it at this point to say that such does not seem to be the case, for the Legislature, out of what appears as greater caution, and perhaps being fearful of just such an interpretation, added a second paragraph to section 50026, providing: "This section *shall not be construed* as authorizing any tax prohibited by section 17041.5 of the Revenue and Taxation Code or any other provision of law . . ." (italics added).

There was, however, as previously observed, an exception in section 17041.5 regarding license taxes on businesses measured by gross receipts. The Legislature, in an apparent effort to also preserve that exception, added the following final clause to section 50026: ". . . nor shall it be construed so as to prohibit the levy or collection of any otherwise

authorized tax upon a business measured by or according to gross receipts." The words ". . . tax upon a business measured by or according to gross receipts" were identical to the words employed in section 17041.5.

Returning to the action filed by Alameda and other counties, the trial court held the San Francisco ordinance invalid. The Court of Appeal affirmed, but a petition for hearing was not lodged with this court. (*County of Alameda* v. *City and County of San Francisco* (1971) 19 Cal.App.3d 750 [97 Cal.Rptr. 175, 48 A.L.R.3d 332].) The appellate court found the tax arbitrary, unreasonable, and discriminatory—denying ". . . to nonresidents the equal protection of the laws." (*Id.,* at pp. 756-757.) The appellate court neither addressed nor decided the two issues presented in the case at bar. Therefore, the effect of the holding was to leave open these issues. The form of the San Francisco tax suggested a way to avoid the "income tax" prohibition of section 17041.5. In fact, in a footnote the appellate court encouraged cities intent upon such taxation by observing: "Although Government Code, section 50026, is obviously intended to prohibit the precise type of ordinance enacted by San Francisco, it is at least questionable that the Legislature possesses the power to prohibit a city from exercising its inherent power of municipal taxation. [Citation omitted.] We cite the section solely as an indication of legislative intent." (*Id.,* p. 757, fn. 3.)

Encouragement to follow the San Francisco lead came from other sources. The decision in the *Alameda* case was rendered on August 30, 1971. Also in 1971, while that case was pending, a Comment in 11 Santa Clara Law. at page 343, was published, concluding that a municipal income tax was valid. Subsequently, in June 1972, another commentator came to the same conclusion. (Sato, *"Municipal Affairs"* in *California, supra,* 60 Cal.L.Rev. at p. 1099, fn. 177.)

C. Taxing Commuters

Various assertions were made in connection with the San Francisco tax as to the number of commuters affected by the tax. (*Alameda* case, *supra,* 19 Cal.App.3d at p. 752; Comment, *supra,* 20 Hastings L.J. at p. 824, fn. 82.) Actual figures covering cities in California were released by the Census Bureau in June of 1973. (U. S. Bureau of the Census, Census of Population: 1970, Subject Reports: Journey to Work. (Issued June 1973.)) The figures disclosed were dramatic illustration of the tremendous movement of workers in and out of central cities.

Although the study indicated that many residents did not disclose their place of employment, among those who did disclose it was revealed that there were more nonresident commuters working in the City of Oakland in 1970 than residents there employed. The figures were 81,000 nonresident workers as compared with only 70,931 resident workers. (*Id.,* p. 198.) It appeared that a tax levied on gross income of all residents and nonresidents employed in Oakland in 1970 would have resulted in 151,931 taxpayers; a tax on all residents employed in Oakland would have resulted in 70,931 taxpayers.

The situation in Oakland was reflected in other cities as well. For San Francisco, it was 419,831 resident and nonresident workers compared with 252,658 resident workers (*Id.,* p. 200); for Sacramento, 153,792 resident and nonresident workers compared with 68,099 resident workers (*Id.,* p. 186, again, more nonresident than resident workers); for Palo Alto, 50,282 resident and nonresident workers compared with only 10,325 resident workers. (*Id.,* p. 203, substantially more nonresident than resident workers.)

The Oakland tax was, it would appear, in a real sense, a "commuter tax," even though levied on both residents and nonresidents. The release of this data in 1973 brings us full circle to the adoption of the subject tax in June of 1974. Let us now turn to the first question posed.

INCOME OR LICENSE TAX

A. Overview

Like the San Francisco "commuter tax," the Oakland tax is labeled a "license fee" for the privilege of engaging in or following any business, trade, occupation or profession as an employee. The fee is measured by 1 percent of gross receipts in excess of a base figure. (§ 5-1.65.) Gross receipts are defined to include ". . . all salaries, wages, commissions, bonuses, or other money payments of any kind . . . ." (§ 5-1.65(g).) Employers are required to withhold the tax. (§ 5-1.65(i).) The only distinct difference from the San Francisco tax is that the Oakland tax is on both residents and nonresidents who work in Oakland. (§ 5-1.65.)

Although the instant tax is designated a "license fee," such declaration is not determinative. This court must look to substance and not mere form. (*Ingels* v. *Riley* (1936) 5 Cal.2d 154, 159 [53 P.2d 939, 103 A.L.R. 1]; *San Francisco* v. *Boss* (1948) 83 Cal.App.2d 445, 450 [189 P.2d 32].)

Classification of a taxing measure is based upon its incidents and the natural and legal effect of the language used. (*Dawson* v. *Kentucky Distilleries & Warehouse Co.* (1921) 255 U.S. 288, 292 [65 L.Ed. 638, 645, 41 S.Ct. 272]; *Douglas Aircraft Co., Inc.* v. *Johnson* (1939) 13 Cal.2d 545, 550 [90 P.2d 572]; *Ingels* v. *Riley, supra,* 5 Cal.2d 154.) Let us examine the tax to determine its true nature.

### B. Identifying Characteristics

Perhaps the most striking feature of the tax is its application to *all* employees in *all* occupations, trades, and professions. In this regard, the tax is unlike the usual license tax on a specific or several specific occupational or business groups. In this way the tax is like an income tax, since such taxes are normally levied upon all income, no matter what the business or occupational source.

The tax is upon the individual employee ("... upon persons who ...") rather than upon the employment (i.e., lawyers, dry cleaning establishments, retail sales). Income taxes are also levied against persons rather than occupations, trades, or businesses, as is the case with license taxes. Thus, income taxes are directed against the *fact of income,* whereas license taxes are directed against the *fact of employment.* By these standards the tax is clearly an income tax.

Historically, and even by definition, license taxes involve the issuance of a "license" to the activity granted the privilege of doing business. Licenses take various forms, but often look like a certificate. Some are prominently displayed in the business establishment. Such licenses are usually granted to dispose of property, pursue a business, occupation or calling, or to exercise a privilege. (*Ingels* v. *Riley, supra,* 5 Cal.2d at p. 157). The Oakland tax makes no provision for the issuance of licenses, nor did the San Francisco commuter tax.

One strongly identifying mechanism of the modern income tax is its withholding provision, a feature characteristic of state and federal income taxes. Municipal income taxes, as employed in other states, usually contain this provision. (*Legislative Developments, supra,* 7 Harv.J.Legis. at p. 273.) On the other hand, license taxes are not usually collected in this manner.

The "gross receipts" occupation tax does have a venerable history in California. (*Ante,* p. 394, and cases cited.) However, examination reveals

that such taxes have been upon the privilege of engaging in a specific area of activity. Such is not true of the income tax, nor of the Oakland tax.

The subject tax is a percentage of the monetary proceeds of labor— characteristic of the income tax. Furthermore, the tax here employed is upon the same source which the State of California includes in its definition of "gross income." (Rev. & Tax. Code, § 17071, subd. (a) (1).)

The tax under consideration is upon all employees. The city contends that employee services are like any other trade or profession, in a generic sense, and hence are as subject to "license tax" as any trade or profession. They are not so treated in other taxing areas. For example, "employee services" are not a "trade or profession" for federal self employment tax purposes. (26 U.S.C. § 1402(c)(2) and (3))

C. Municipal Income Taxes

The city alludes to the fact that "gross income" under state law (Rev. & Tax. Code, § 17071) and the federal income tax statute, (Int. Rev. Code, § 61) includes "interest," "rents," "royalties," and other sources which the Oakland tax does not reach. Further, the city asserts that the normal income tax is based on net income after deduction of business expenses and costs of production of income, whereas the Oakland tax is a gross levy. Thus, it argues, the gross receipts feature of Oakland's levy, like some license taxes, together with credit for duplicative license fees, evidences a coordinated business tax system. Let us examine these assertions.

First, section 17041.5 prohibits cities from imposing a tax not only upon "income" per se, but upon "any part thereof"; thus, the fact that Oakland seeks to tax only compensation for services, and not other sources, does not mean that the Oakland tax is any less a prohibited tax. Second, Revenue and Taxation Code, section 17071 lists "compensation for services" as one category of income, and "gross income derived from business" as another, illustrating that under California tax statutes, for tax purposes, there is a distinction between business receipts and employee compensation. The city would blur and thus obliterate this distinction. Third, while the subject tax is distinct in structure and operation from complex state and federal income tax measures, it is *very like the typical municipal income tax.*

City income taxes, as they exist in jurisdictions which permit them, tend to be: (1) flat-rate (i.e., not graduated); (2) levied upon earned income; (3) without deductions, other than perhaps an initial exclusion of a designated amount; (4) collected by employer withholding; and (5) at the rate of either ½ or 1 percent. Oakland's tax has the exact profile of a typical municipal income tax. (*Legislative Developments, supra,* 7 Harv.J.Legis. at p. 273; Januta, *supra,* 56 Cal.L.Rev. at p. 1555 & fn. 151.)

Finally, the giving of a credit for duplicative license fees, rather than evidencing a coordinated business tax system, became a necessary credit when the city sought collection twice from the same source.

The majority, while concurring that city income taxes generally resemble the Oakland tax, points to the typical municipal income tax as being one imposed upon ". . . *all* earned income of city residents, whether for services rendered inside or outside the taxing jurisdiction" as demonstrating that the Oakland tax is significantly different from the conventional municipal income tax. (*Ante,* p. 393.)

However, one reason the typical ordinance is so structured is that in ". . . most ordinances a credit is allowed to a resident whose income is being taxed by another municipality up to the amount of the local tax . . . ." (*Legislative Developments, supra,* 7 Harv.J.Legis., at p. 273.) Furthermore, census figures indicate that, at least as of 1970, the Oakland tax was structured to reach 13,263 more taxpayers by taxing nonresidents and residents who work in Oakland than by taxing Oakland residents who worked in and out of Oakland. (U. S. Census, *supra,* p. 198.) The deviation in form appears to have rendered Oakland a substantial financial benefit. Finally, since Oakland labeled its tax a "license tax" and attempts to exempt it from the first paragraph of section 17041.5, as a "license tax upon a business measured by or according to gross receipts," Oakland was faced with the California "license tax" cases holding that such "license tax" could not be based on income derived outside the taxing jurisdiction. (*City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d 823, 831-833 [271 P.2d 5], app. dism. 348 U.S. 907 [99 L.Ed. 711, 75 S.Ct. 292]; *Ferran* v. *City of Palo Alto* (1942) 50 Cal.App.2d 374 [122 P.2d 965].) By taxing only residents who work in Oakland, and commuters, Oakland gained more taxpayers and at the same time avoided the extraterritorial problem to which the label adopted subjected the tax.

The majority examined business or occupation tax cases and gross receipts occupation tax cases at length (*ante,* p. 394); concluding that the Oakland tax differs materially from other license taxes in that: (1) it covers *all* trades, and professions; and (2) it reaches the individual employee; both characteristics of an income tax and reviewed earlier in this dissent. However, the majority uses this observation as a springboard to conclude that the city not only has the power to tax a part, but also has the power to tax the whole. In other words, the majority asserts that there is no serious question but what a municipality may tax every single occupation (i.e., each worker's job) within the city. (*Ante,* p. 395.) Thus concluding, the majority then asserts that such tax is not converted to an income tax simply because measured by employee compensation. That is, the measure or mode of ascertaining a tax is not conclusive as to its nature. (*Ante,* pp. 396-397.) The majority next observes that Oakland's tax is exacted only from persons exercising the privilege of selling services in the city and only to the extent they do so. (*Ante,* pp. 396-397.) Finally, the majority gives deference to its label, and finds it is the privilege and not the income generated which is taxed, citing *City of Louisville* v. *Sebree* (1948) 308 Ky. 420 [214 S.W.2d 248, 253-254]. (*Ante,* p. 397.)

In summary, in order to avoid conflict with section 17041.5, the majority reasons: (1) a city may tax every job in the city; (2) though the tax be measured by compensation, that is not conclusive as to its nature; (3) just those exercising the privilege of selling services are taxed, and to the extent services are sold; (4) the label is entitled to deference; (5) it is the privilege and not the income generated by its exercise which is taxed; and (6) hence the Oakland tax is an excise or license tax. Let us review this reasoning.

Section 17041.5 is in two parts. The first part states what the city may *not* do. It may *not* levy any tax upon the income, or any part thereof, of any person, resident or nonresident. The second part states what the city *may* do. It *may* levy a license tax upon a business measured by gross receipts.

The majority reasons that the city may levy a license tax upon every job in the city. This may be true; however, the city has measured that tax by the gross income of each employee. In its next step in reasoning the majority asserts that the measure (here admittedly employee compensation) is not conclusive as to its nature. That is a correct statement, as far as it goes; but it does not answer the challenge of the first part of section 17041.5. The Oakland tax is on income, or a part thereof. In order to

avoid the proscription of section 17041.5, the tax must be brought under the second paragraph of that section. This the majority seeks to do by its last three steps in reasoning: (3) just those exercising the privilege of selling services are taxed; (4) the label is entitled to deference; and (5) it is the privilege and not the income taxed. Further confirmation that this is what the majority is asserting is found in its statement that Oakland's license fee is ". . . expressly authorized by the final paragraph of section 17041.5." (*Ante,* p. 391.)

How has the majority reached the conclusion that the tax is authorized by the last paragraph of section 17041.5? There is nothing in steps (3), (4) and (5) above which leads to that conclusion, except perhaps deference to label. In fact, the last paragraph of section 17041.5 is not discussed by the majority at any point in the reasoning cited. (*Ante,* pp. 395-397.) Yet, this is the heart of the issue posed. Is the Oakland tax a ". . . license tax upon a business measured by or according to gross receipts?" Let us address that question.

Whether the Oakland tax is a license tax or an income tax has been treated at length above. That discussion applies to the use of the term "license tax" in section 17041.5. Next, section 17041.5 says "upon a business." Here lies a second stumbling block. The Oakland tax is not "upon a business." It is upon "persons" holding jobs in Oakland measured by their gross compensation. Why did the Legislature use the words "business measured by or according to gross receipts" in section 17041.5? The most logical explanation is that the Legislature used that language to exempt the traditional municipal business license taxes measured by gross receipts. These were familiar to legislators at the time of the enactment. Such taxes represent excise taxing practice employed by cities over many years. To sustain the majority conclusion, the Legislature would have had to intend, by the last paragraph of section 17041.5, that a "license tax upon a business measured by or according to gross receipts" meant a percentage levy on the gross income of every employee. Yet, that is the very tax prohibited in the first paragraph of section 17041.5. It would seem clear that the Legislature had no such intention.

Employee compensation (i.e., gross income) may not be taxed under the first paragraph of section 17041.5. To avoid this prohibition the city has labeled its tax on gross income one on "gross receipts." This is done to qualify employee compensation for the exception of the second paragraph of section 17041.5. When it comes to fitting a tax on gross

income of employees into the term "gross receipts" in the second paragraph of section 17041.5, the city is faced with the qualifying language "tax upon a business measured by or upon gross receipts." A tax on employee compensation could be upon a "business" or it could not, depending on who is taxed and for what.

Lastly, the majority concluded this portion of its discussion with a citation to the *Sebree* case. (*Ante,* p. 397.) The *Sebree* case involved interpretation of a Louisville, Kentucky, occupation tax measured by earnings or profits. The court held that such tax was not an "income tax" within the meaning of the Kentucky Constitution. Actually, the United States Supreme Court, interpreting the very same Louisville occupation tax held that it was an "income tax" for purposes of the Buck Act. (*Howard* v. *Commissioners of Louisville* (1953) 344 U.S. 624, 629 [97 L.Ed. 617, 622, 73 S.Ct. 465]); see also, *Dole* v. *City of Philadelphia* (1940) 337 Pa. 375 [11 A.2d 163], similar measure held to be an "income tax.") Also, the opinion in *Sebree* acknowledged that a similar tax in Missouri had been found to be an income tax. (*Carter Carburetor Corp.* v. *St. Louis* (1947) 356 Mo. 646, 653 [203 S.W.2d 438, 440].) The *Carter* tax was labeled an "earning tax" and was imposed on residents and nonresidents earning income in St. Louis.

D.  Government Code Section 50026

This brings us to the majority discussion of Government Code, section 50026. (*Ante,* pp. 397-398, 412-413, quoting the text of § 50026 in full.) As observed above, when San Francisco was about to adopt its "commuter tax" on gross income (the sister tax to the Oakland tax), the Legislature reacted by quickly enacting section 50026 invalidating that kind of levy. The majority asserts that section 50026 is "pointless and redundant if section 17041.5 is construed as enjoining *all* municipal occupation taxes measured by employee compensation . . . ." (*Ante,* p. 397.)

It is neither "pointless nor redundant" when viewed in the context of events as they were transpiring in 1968. San Francisco was about to enact a tax on commuters measured by gross income; a tax which was worded like a license tax. The Legislature desired to invalidate such tax. Therefore, the Legislature in section 50026 referred to any chartered city authorized to impose ". . . any tax on the privilege of earning a livelihood by an employee . . ." (the typical occupational license tax language that the San Francisco tax was written to resemble); then, went on to provide ". . . or any other tax, fee, or charge on or measured by the earnings, or

any part thereof, of any employee . . ." (the actual tax measure adopted in the San Francisco tax). Having identified the kind of tax prohibited, section 50026 then went on to outlaw the levying of such a tax upon commuters unless the same tax were levied on residents.

Realizing that by specifically invalidating the discriminatory feature of the San Francisco tax, section 50026 could be interpreted to imply that *non*discriminatory employee taxes measured by gross income were valid, the Legislature added a second paragraph directing that section 50026 ". . . *shall not be construed*" as authorizing any tax prohibited by section 17041.5. (Italics added.) Now the majority is doing exactly what the Legislature stated that it should not do. It is construing section 50026 so as to authorize a tax prohibited by section 17041.5. (*Ante*, pp. 397-398.)

For all of these reasons it is respectfully concluded that the Oakland tax, having the incidence and natural and legal effect of an income tax, is actually an income tax labeled and drafted to appear as a license tax. Having so concluded, it now becomes necessary to determine whether a chartered city may, in the exercise of powers conferred by the home rule provisions of the Constitution, levy such a tax.

CONSTITUTIONAL ISSUE

A. Home Rule Provision

In California a chartered city derives its power to legislate from a direct constitutional grant. Within the framework of the power granted, a chartered city is an autonomous political entity. (Sato, *"Municipal Affairs" in California, supra,* at pages 1055-1075[1]; but see *Strumsky And The Source Of California Chartered City Powers* (1975) 6 Pacific L.J. 85, arguing that *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], identifies the Legislature as the sole source of a charter city's powers.)

Pursuant to article XI, section 5, subdivision (a) of the California Constitution charter cities are given the power to ". . . make and enforce

---

[1]An exhaustive examination of municipal home rule is found in a series of articles by Professor Peppin: *Municipal Home Rule in California: I* (1941) 30 Cal.L.Rev. 1; *Municipal Home Rule in California: II* (1942) 30 Cal.L.Rev. 272; *Municipal Home Rule in California: III* (1944) 32 Cal.L.Rev. 341; *Municipal Home Rule in California: IV* (1946) 34 Cal.L.Rev. 644; a more recent examination of the area is Van Alstyne, Background Study Relating to Article XI: Local Government, pages 184-206, 210-263 discussing the issues here considered (Cal. Const. Revision Com. 1966).

all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters. . . ." Thus, the power granted is to make laws pertaining to "municipal affairs." Limitation of the power granted (i.e., to "municipal affairs") is emphasized by the further qualification that ". . . in respect to other matters . . . (charter cities) shall be subject to general laws."

Assuming the Oakland tax is an income tax, the second issue is whether Oakland may, in the exercise of its power to legislate respecting municipal affairs, levy such a tax.

B. Municipal Affairs

To the courts has fallen the task of determining the form and content of the general phrase "municipal affairs." Such determination is based upon the facts and circumstances surrounding each case. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 62 [81 Cal.Rptr. 465, 460 P.2d 137]; *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809]; *Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 294 [32 Cal.Rptr. 830, 384 P.2d 158]; *In re Braun* (1903) 141 Cal. 204, 214 [74 P. 780], conc. opn. by McFarland, referring to them as "loose, indefinable, wild words.")

Local legislation of a charter city prevails over general law only when the subject matter is "exclusively," "solely," or "strictly" a municipal affair. (*Professional Fire Fighters* v. *City of Los Angeles, supra,* 60 Cal.2d at p. 291; *Ex Parte Nowak* (1921) 184 Cal. 701, 704 [195 P. 402, 403].) Conversely, where the subject matter is one of general or statewide concern, general law prevails and the charter city is subject to and controlled by the state legislation. (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d at pp. 61-62; *Professional Fire Fighters* v. *City of Los Angeles, supra,* 60 Cal.2d at pp. 292-293; *Pacific Tel. & Tel. Co.* v. *City and County of San Francisco* (1959) 51 Cal.2d 766, 768-769 [336 P.2d 514]; *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 369-370 [125 P.2d 482, 147 A.L.R. 515].)

As conditions in the state change, what was once a matter of local concern may later become a matter of general or statewide concern controlled by general law. (*Pacific Tel. & Tel. Co.* v. *City and County of San Francisco, supra,* 51 Cal.2d at p. 771.) The categories of "municipal affairs" and "of general or statewide concern" are not mutually exclusive. Some portions of a local matter may ultimately become of general state interest. (*In re Hubbard, supra,* 62 Cal.2d at p. 127.)

The opinion in the *Professional Fire Fighters* case, *supra,* 60 Cal.2d at pages 293-294, assembled some 23 cases, "all dealing with various phases of municipal affairs held to be subject to general laws on the basis of statewide concern." A further discussion of matters of general or statewide concern is set forth in 5 Witkin, Summary of California Law (8th ed.) Constitutional Law, section 452.

Have additional rules or guidelines been developed? In the *Professional Fire Fighters* case, *supra,* at page 292, Justice Peters, writing for a unanimous court, concluded from review of the case authorities, that ". . . general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern." Note that this statement does not suggest a "balancing test" between state and local interests. To the contrary, the inquiry is directed to determination of the presence of a statewide concern, and if the matter is of statewide concern, that determines the issue. On the question of what is of local or statewide concern the opinion states: "This question must be determined from the legislative purpose in each individual instance. In the instant case it would appear that the Legislature was attempting to deal with labor relations on a statewide basis." (*Id.,* p. 294.) The court found "labor relations" a statewide concern. (*Id.,* p. 295.)

How do the doctrines of conflict and preemption affect the inquiry? Unfortunately, these issues have at times injected confusion into the municipal affairs question. Whereas charter cities derive their "home rule" authority from section 5 of article XI, every city (charter and general law) is granted so-called police powers under section 7 of article XI to ". . . make and enforce within its limits all local, police, sanitary and other ordinances and regulations *not in conflict with general laws.*" (Italics added.) It is from this general grant and the "not in conflict" limitation that the issues of conflict, preemption, and occupation of the field are derived. In the case before us, Oakland is not claiming authority to tax under its police powers, because of the preemption statute. (Rev. & Tax. Code, § 17041.5.) Instead, Oakland shifts the battleground to its home rule authority, seeking to avoid the strictures of conflict and preemption.

In the case before us, the issue is statewide concern versus municipal affairs. However, the preemption statute is one important factor evidencing a general statewide concern. Justice Peters explained the interrelationship of preemption and municipal affairs thus: "Although the parties

argue this issue as one of state preemption, it is not, strictly speaking, predicated on full occupation of the field. The exclusive right of a chartered city . . . to regulate turns on whether or not the subject matter is a municipal affair. In other words, if it is exclusively a matter of state concern, chartered cities have no authority to act at all. [Citation omittted.] Of course, a particular subject may be both a municipal affair and of statewide concern. *Since the question whether the subject is of state concern is often determined by whether or not the state has enacted legislation, preemption or full occupation of the field may become one, but only one, test of whether the given subject is a municipal affair.*" (*In re Hubbard, supra,* at p. 127; italics added.)

Justice Peters further elaborated upon the rule in his dissent in the *Bishop* case, *supra,* 1 Cal.3d at page 66: "In other words, in cases of conflict and preemption, the inquiry ends once a statewide concern is found, and there is no need to weigh the state and municipal concerns or to determine which should predominate." In other words, no need to weigh such concerns because the problem was not a conflict or preemption problem but a problem of statewide concern under the municipal affairs section. Note again the specific disclaimer of a "balancing test."

Justice Peters, citing cases to illustrate, suggests that decisions fall into one of four categories (*Id.,* p. 67): (1) solely state concerns, and the subject matters of municipal regulation and the state statute do not affect municipal affairs (*Wilson* v. *Beville* (1957) 47 Cal.2d 852, 856-857 [306 P.2d 789]); (2) the subject matter of the municipal regulation and the state statute involves both municipal and statewide concerns (*In re Hubbard, supra,* 62 Cal.2d 119); (3) the subject matter is one ordinarily subject to municipal regulation, but parts of the subject may also involve statewide concern (*Professional Fire Fighters, supra,* 60 Cal.2d 276); and (4) the subject matter solely involves municipal affairs and no matters of statewide concern are involved (*City of Pasadena* v. *Charleville* (1932) 215 Cal. 384 [10 P.2d 745], a decision the dissent in *Bishop* would disapprove).

Is there any conflict between the rules and guidelines above stated and the decision of the majority in the *Bishop* case? It does not appear that there is. First, it should be noted that the views expressed by the majority in the *Bishop* case on the municipal affairs issue were not necessary to the decision. The majority held that the Legislature did not intend that the state law apply to the setting of salaries of city employees, whether chartered or not. (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d at p. 63.)

Thus, a resolution of the municipal affairs question was not required. Second, the *Bishop* majority opinion does not disapprove or overrule the *Professional Fire Fighters* case. The majority opinion in *Bishop* left those rules intact. Third, and finally, there is nothing in the *Bishop* majority opinion contrary to the rules hereinabove outlined.

The majority in *Bishop* stated (*supra,* 1 Cal.3d at pp. 61-62): "As to . matters which are of statewide concern, however, home rule charter cities remain subject to and controlled by applicable general state laws regardless of the provisions of their charters, if it is the intent and purpose of such general laws to occupy the field to the exclusion of municipal regulation (the preemption doctrine)." At first blush, this statement of the rule seems inconsistent with the language which follows. However, when read with the subsequent statement (*supra,* p. 63): ". . . the Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern," it appears that the majority was merely restating the rule of the *Professional Fire Fighters* case. The majority in *Bishop* was not saying that the Legislature literally has no effect on the determination of what matters are of statewide concern by the legislation it enacts. The *Bishop* majority was saying, in effect: "Since the question whether the subject is of state concern is often determined by whether or not the state has enacted legislation, preemption or full occupation of the field may become one, but only one, test of whether the given subject is a municipal affair." (*In re Hubbard, supra,* 62 Cal.2d at p. 127.)

## C. Regulation and Revenue

It has been asserted that numerous subjects found to be of statewide concern over the past 80 years all involved activities essentially regulatory in nature.[2] In contrast, on the specific issue of taxation for revenue only, numerous cases declare without equivocation or qualification that impos-

[2]E.g., *Baron v. City of Los Angeles* (1970) 2 Cal.3d 535 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036] (city lobbyists regulation, insofar as it impinges upon state regulation of the practice of law); *City of Santa Clara v. Von Raesfeld, supra,* 3 Cal.3d 239 (intercity water pollution control project and its funding procedure); *Professional Fire Fighters, Inc. v. City of Los Angeles, supra,* 60 Cal.2d 276 (organizational rights of city employees); *Pipoly v. Benson, supra,* 20 Cal.2d 366 (regulation of highway traffic passing through city streets); *Bay Cities Transit Co. v. Los Angeles* (1940) 16 Cal.2d 772 [108 P.2d 435] (regulation of interurban transportation system); *Young v. Superior Court* (1932) 216 Cal. 512 [15 P.2d 163] (public improvement project extending beyond city limit); *CEEED.v. California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306 [118 Cal.Rptr. 315] (regional land use planning); *Wilson v. City of San Bernardino* (1960) 186 Cal.App.2d 603 [9 Cal.Rptr. 431] (highway development); *County of San Mateo v. City Council* (1959) 168 Cal.App.2d 220 [335 P.2d 1013] (annexation procedures); cf., *Century Plaza Hotel Co. v. City of Los Angeles* (1970) 7 Cal.App.3d 616 [87 Cal.Rptr. 166] (taxation/regulation of alcohol).

ing taxes for revenue purposes is a municipal affair.[3] The distinction drawn between regulatory state legislation (of statewide concern) and local taxation for revenue only (a municipal affair) may have historical support; however, there is no reason to conclude that such distinction must be drawn in the instant case. To the contrary, it seems just as evident that the Legislature intended to prohibit local taxation for revenue in order to control the entire field for *both regulatory and revenue purposes.*

Furthermore, there is no longer any reason to conclude that local tax ordinances are, by their nature, municipal affairs. Local revenue raising has, in many instances, become of compelling statewide concern. One need only view the legislative turmoil over local property tax relief and equalization of school revenues to recognize what an overriding state interest may be involved in local taxation.

Of the cases cited as declaring local taxation for revenue only a municipal affair, all but two did not involve a direct conflict with state law. In most the issue was whether the city was empowered to act at all, even without prohibition by general law. Of the cases cited, only two actually held local ordinances superior to the conflicting state enactment, and both of those arose near the turn of the century and involved the same state statute. (*Ex Parte Braun, supra,* and *Ex Parte Helm* (1904) 143 Cal. 553 [77 P. 453].)

Each case cited involved an excise tax. Therefore, with respect to a tax other than an excise tax, the statement that a revenue tax is a municipal affair is dicta. Finally, the tax cases cited involved excise taxes with no extraterritorial effect. In contrast, the tax before us: (1) involves direct conflict with state law; (2) is an income not an excise tax; and (3) has an extraterritorial effect.

The guidelines enunciated in this dissent were applied in *Century Plaza Hotel Co.* v. *City of Los Angeles* (1970) 7 Cal.App.3d 616 [87 Cal.Rptr. 166]. There Los Angeles imposed an excise tax of 5 percent upon the purchase of alcoholic beverages sold by a retailer for consumption on the premises. The tax was a local tax for revenue only. The appellate court

---

[3]*A.B.C. Distributing Co.* v. *City and County of San Francisco, supra,* 15 Cal.3d 566, 571; accord *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d 21, 74; *City of Glendale* v. *Trondsen, supra,* 48 Cal.2d 93, 99; *Ainsworth* v. *Bryant, supra,* 34 Cal.2d 465, 469; *West Coast Adver. Co.* v. *San Francisco, supra,* 14 Cal.2d 516, 524; *Ex Parte Helm* (1904) 143 Cal. 553, 557 [77 P. 453]; *Ex Parte Braun, supra,* 141 Cal. 204, 211-212; *Franklin* v. *Peterson, supra,* 87 Cal.App.2d 727, 732.

framed the issue as: "Does the Ordinance Represent a Valid Exercise of the Powers of a Charter City Over Its Municipal Affairs?" Finding the matter of statewide concern, the appellate court held the ordinance invalid. Petition for hearing by this court was denied. (*Id.,* at p. 626.)

In thus holding, the appellate court: (1) framed the issue as involving the "home rule" provisions of section 5, subdivision (a), and not the "in conflict with" provisions of section 7 of article XI (*id.,* at p. 620 and fn. 3); (2) found both conflict and preemption (*id.,* at p. 624); (3) noted that under *Bishop* the legislative intent is not conclusive (*id.,* at p. 625); (4) examined the reasons for preemption expressed by the Legislature (*id.*); (5) examined matters of statewide concern (*id.,* at p. 626); and (6) found "no purely municipal affair ... but a matter of statewide significance." In short, the court of appeal applied the analysis of the *Professional Fire Fighters* and *Bishop* cases, as set forth above.

Applying these rules and guidelines, the first question presented is whether there is conflict or preemption in the case before us.

D. Preemption

The Legislature, pursuant to the authority granted under article XIII, section 26, subdivision (a), adopted a comprehensive state income tax system in 1935. (Stats. 1935, ch. 329, p. 1090 et seq.) Section 17041.5, a part of the state income tax regulatory and revenue raising system, prohibits charter cities from levying a tax upon the income, or any part thereof, of any person, resident or nonresident. (See Rev. & Tax. Code, §§ 17001 to 19500 for state income tax provisions.) There could be no more definite case of preemption than that seen here.

The preemption section enacted in 1963 was initially effective for two years. However, in 1965, the section became permanent by reason of the repeal of the automatic repealer clause. The intent to preempt was reaffirmed by the Legislature in 1968. Acting to outlaw the San Francisco commuter tax on income, the Legislature specifically stated: "This section shall not be construed as authorizing any tax prohibited by section 17041.5 of the Revenue and Taxation Code or any other provision of law ...." (Gov. Code, § 50026.)

E. Statewide Concern

Finding preemption evidences a strong indication that the subject matter is of statewide concern. Here the field has been occupied by a

comprehensive statute, and local legislation has been specifically prohibited. The importance of preemption as one factor showing statewide concern is illustrated by the statement of Justice Peters in the *Bishop* case: "If it be assumed that there are some matters so local in nature that the Legislature's power to regulate will be limited to nonchartered cities . . . it is apparent that such matters must be very rare." (*Bishop* case, *supra,* 1 Cal.3d at pp. 68-69.)

The extraterritorial effect of the Oakland tax is obvious. This court has taken judicial notice of the rapid growth of suburban areas in California and the high rate of mobility of the citizens of the state. (*In re Lane* (1962) 58 Cal.2d 99, 111 [22 Cal.Rptr. 857, 372 P.2d 897] (conc. opn.).)

In the 1968 reaffirmance of the intent to preempt set forth in Government Code, section 50026, the Legislature declared: "The Legislature finds and declares that the right of citizens of California to move freely about the state in search of employment is a matter of statewide interest and concern. Any unnecessary barriers which impede the mobility of citizens of this state or limit their choice of employment are contrary to state policy." (Stats. 1968, ch. 559, § 3.)

Other factors evidencing statewide concern include: (1) the effect of the tax on out-of-county workers regarding free inter-city travel; (2) the effect on nonresident work decisions; (3) the redirection of business market forces; and (4) the effect on nonresident residential decisions. All these factors demonstrate extraterritorial impact.

It appears that large numbers of commuters are subject to the Oakland tax. These persons have no voice in the adoption of such tax, the level of tax imposed, the duration of the levy, or even the expenditure of the tax proceeds thus extracted. It is taxation without representation, a matter of evident statewide concern.

If the subject tax were held to be a municipal affair, the entire municipal field would be opened to creation of a crazy quilt of overlapping taxing jurisdictions. Drawing from the federal-state parallel: "If fifty independent economic units within the United States are undesirable, 387 economic enclaves within California would be intolerable." (Sato, *supra,* 53 Cal.L.Rev. 801, 818 (1965); see also, *City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108, 119 [93 Cal.Rptr. 1, 480 P.2d 953].) Such taxation problems are indeed matters of grave statewide concern.

The issue before us should not be encapsulated. Viewed from outside its geographic boundaries, it is apparent Oakland is not a law unto itself. Other communities will be affected by and react to the Oakland tax—in some the tax may well spark retaliation. These too are matters of statewide concern.

Neither the economic wisdom nor the social propriety of a municipal income tax is within our purview. These are, however, matters of concern to the Legislature; and to the degree such taxing decisions affect nonresident citizens and other taxing structures, such matters are of statewide concern.

Local income taxes, such as at issue here, have been criticized as regressive, imposing the greatest proportionate burden on those whose income is lowest. Excluding interest, dividends, and capital gains also favors the rich. The tax fails to recognize that gross income is not always an accurate measure of taxpaying abilities. (*Legislative Developments, supra,* 7 Harv.J.Legis., at pp. 274-281.) Proponents argue that the low rate reduces the inequities. There is no guarantee such rates will remain low, especially in view of rising costs and increased reluctance to raise property taxes.

The license tax form creates arbitrary results. Neighbors, one working within the city and one without, are taxed at different levels—yet receive identical services. Nonresidents do not receive the same benefits as residents, yet both are taxed at the same rate. The tax is also thought unfair to those commuters who may live in a community without income taxes but with resultingly high property taxes. Such commuters could be required to pay both taxes. All of these alleged inequities are not for us to evaluate, but they are matters of statewide concern, once one's perspective exceeds the geographic boundaries of Oakland.

For all of these reasons, I respectfully conclude that the subject matter is of general or statewide concern and the instant tax is invalid. The judgment of the trial court should be affirmed.